**WOMEN PRISONERS OF the DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS, et al., Appellees,**

v.

**DISTRICT OF COLUMBIA, et al., Appellants.**

**Nos. 95–7041, 95–7205.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 22, 1996.

Decided Aug. 30, 1996.

---

912

Edward E. Schwab, Assistant Corporation Counsel, with whom Charles L. Reischel, Deputy Corporation Counsel, and Garland Pinkston, Jr., Principal Deputy Corporation Counsel, were on the briefs, argued the cause for appellants. Lutz A. Prager, Assistant Deputy Corporation Counsel, entered an appearance.

Peter J. Nickles, Washington, DC, with whom Caroline M. Brown, Tracy A. Thomas, and Brenda V. Smith, were on the brief, argued the cause for appellees.

Before SILBERMAN, BUCKLEY, and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Opinion filed by Circuit Judge ROGERS, concurring in part and dissenting in part.

BUCKLEY, Circuit Judge:

In this case, appellants raise a number of challenges to a district court judgment ordering them to improve conditions at various District of Columbia ("District" or "D.C.") facilities in which women are imprisoned. The district court found that the existing conditions violated the following statutory and constitutional provisions: (1) D.C.Code § 24–442, which creates a tort remedy for negligence by prison officials; (2) Title IX, Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, which requires recipients of federal aid to provide men and women with equal access to educational programs and activities; (3) the equal protection guarantee of the Fourteenth Amendment of the United States Constitution, as applied to the District through the Fifth Amendment; and (4) the Constitution's Eighth Amendment guarantee against cruel and unusual punishment.

The court's order contains provisions relating to sexual harassment; obstetrical and gynecological care; academic, vocational, work, recreational, and religious programs; general living conditions; and fire safety. We hold that (1) the district court abused its discretion in exercising supplemental jurisdiction over claims arising under D.C.Code § 24–442, (2) Title IX and equal protection principles are not applicable here because the male and female prisoners whom the district court compared were not similarly situated, and (3) certain provisions of the district court's order provide broader relief than is necessary to remedy the violations of the Eighth Amendment. In addition, we remand the case to the district court to determine whether other portions of its order are inconsistent with the recently enacted Prison Litigation Reform Act.

## I. BACKGROUND

### A. The Facilities

Until recently, the District maintained no facility for women serving sentences of more than a year; all such offenders were sent to federal penitentiaries scattered throughout the country. The District has since assumed custody of such women, and it now houses them in three facilities: the Lorton Minimum Security Annex ("Annex"), the Correctional Treatment Facility ("CTF"), and the Central Detention Facility ("Jail"). The first of these facilities is located in Lorton, Virginia; the latter two in the District.

The Annex, which is situated on the grounds of the men's Minimum Security Facility ("Minimum"), consists largely of a few converted military barracks that serve as dormitories. The women in the Annex are escorted to Minimum at specified times to attend academic courses and use the gymnasium. As of January 1994, there were 936 men at Minimum and 167 women at the Annex. In this class action, the female inmates at the Annex raise challenges involving sexual misconduct, their general living conditions, and discrimination in access to academic, vocational, work, recreational, and religious programs on the basis of their sex. The medical care provided to female inmates at the Annex is governed by a separate consent decree.

CTF was designed as an 800–bed diagnostic and treatment center for offenders with special needs. In early 1992, however, the District converted part of CTF into a facility that, as of January 1994, housed 271 general population, medium-custody female inmates. In this class action, the female inmates at CTF present challenges involving sexual misconduct, their general living conditions, the quality of their obstetrical and gynecological care, and discrimination in access to academic, vocational, work, and recreational programs on the basis of their sex.

The Jail is a medium to maximum security correctional facility. As of January 1994, it housed 168 female inmates who were either awaiting trial or sentencing or who were sentenced misdemeanants. In this action, the inmates at the Jail have limited their challenges to allegations of sexual misconduct. Medical care at the Jail is regulated by a separate consent order.

## B. Procedural History

The complaint in this class action was filed on October 1, 1993. The class ("appellees"), which is comprised of the female inmates at the Annex, CTF, and the Jail, was certified without objection. The defendants include the District, the District of Columbia Department of Corrections ("Department" or "DCDC"), the District of Columbia General Hospital Commission, and numerous District officials, all in their official capacities (collectively, "appellants").

Following a three-week trial, the district court issued an opinion on December 13, 1994, in which it found multiple violations of federal and local law. *Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia,* 877 F.Supp. 634 (D.D.C.1994) *("Women Prisoners I").* On the same day, the court issued an order consisting of 138 paragraphs of instructions ("Order") that were intended to correct the violations. *Id.* at 679–90. The defendants subsequently moved the district court to amend the Order or stay its enforcement. The court denied the motion to amend in its entirety, and denied the motion to stay except as to four paragraphs of the Order.

On March 2, 1995, the District filed a motion for a stay pending appeal to this court. We ordered that the case be held in abeyance pending additional proceedings in the district court on appellants' motion to stay. *Women Prisoners of the District of Columbia Dep't of Corrections v. District of Columbia,* No. 95–7041 (D.C.Cir. Apr. 4, 1995).

On remand, the District filed a revised motion to stay and/or modify the judgment. After a review of the parties' briefs and oral argument, the district court temporarily stayed thirty paragraphs and ordered the parties to attempt to negotiate an agreement concerning those paragraphs. The parties eventually reached agreement as to 26 of the paragraphs and jointly moved the court to amend the Order.

On August 14, 1995, the district court issued a second opinion in which it supplemented the legal conclusions of the first opinion and denied appellants' motion for a stay of the Order. *Women Prisoners of the District of Columbia Dep't of Corrections v. District of Columbia,* 899 F.Supp. 659 (D.D.C.1995) *("Women Prisoners II").* The court also issued a second order that modified 23 paragraphs of the Order and vacated six others. *Id.* at 677–79.

## C. The District Court's Opinions

### 1. *Factual findings*

#### (a) *Sexual Harassment at the Jail, CTF, and the Annex*

About a half dozen female inmates testified at trial that they had been sexually assaulted by prison guards. *See, e.g.,* testimony of Jane Doe W, Trial Transcript ("Tr.") at Volume I, page 36 ("I–36"), Jane Doe Q (Tr. at I–74), Jane Doe OOO (Tr. at I–100), Jane Doe Five (Tr. at IV–66), Jane Doe RR (Tr. at VI–124) and Jane Doe Z (Tr. at VII–64). The district court concluded from this testimony that there had been "many incidents of sexual misconduct between prison employees and female prisoners in all three of the womens' [sic] facilities in this case." *Women Prisoners I,* 877 F.Supp. at 639. The court found that the level of misconduct ranged from inappropriate remarks to invasions of privacy to violent sexual assaults. *Id.* at 639–40.

According to the court, one of the "most disturbing" aspects of this misconduct was "the inadequacy of the Defendants' response to these attacks." *Id.* at 639. The court found that while the DCDC had adopted policies and procedures designed to address sexual misconduct, "[t]hese various policies and procedures are of little value because the [Department] address[es] the problem of sexual harassment of female prisoners with no specific staff training, inconsistent reporting practices, cursory investigations and timid sanctions." *Id.* at 640 (internal citation omitted).

#### (b) *Obstetrical and Gynecological Care at CTF*

The district court found that the District had provided inadequate women's medical care, specifically concluding that the care provided them was deficient in the following

areas: gynecological examination, testing for sexually transmitted diseases, follow-up care, health education, and prenatal care and education. *Id.* at 643–48. The court was also concerned about appellants' use of physical restraints on pregnant inmates when they were transported to the hospital. *Id.* at 646–47.

#### (c) Physical Conditions of Confinement

The district court also found problems with the physical condition of the buildings at CTF. The court observed that the facility had originally been constructed as a treatment center for inmates with special needs. *Id.* at 648–49. Its buildings were connected by covered walkways that created a closed-in setting designed only for controlled movement. *Id.* The court concluded that CTF had several structural flaws, including insufficient heating, a malfunctioning ventilation system, and defective toilets. *Id.* at 649–50.

The court found that the Annex inmates were housed in converted military barracks that were not initially designed for continued residency, that renovations and preventative maintenance have been either lax or non-existent, and that the dormitories were inadequately ventilated. *Id.* at 651–52. The court also found that the dormitories were overcrowded, and that this overcrowding had created a shortage of sanitary facilities, increased the risk of spreading infectious diseases, produced high noise levels, and created filthy living conditions. *Id.*

The court further found that fire hazards existed at both CTF and the Annex. The court identified the following difficulties at CTF: the sprinkler system was inadequately maintained; water leakage occurred in areas of the building where electrical equipment is exposed; and fire drills were seldom, if ever, conducted. *Id.* at 653–54. At the Annex, the court found that the level of fire safety was "grossly inadequate": its fire alarm system was "antiquated," little was done in the way of fire drills and staff training, the dormitories contained excessive quantities of combustible materials and inadequate compartmentalization to contain fire, and there were not enough exits to accommodate the number of people living at the facility. *Id.* at 654–55.

#### (d) Programs

The district court found that female inmates at CTF and the Annex did not have access to educational, vocational, work, recreational, and religious programs equal to those made available by the District to similarly situated men. *Id.* at 656–62, 677–78. In reaching this conclusion, the court compared the programs offered to the women with those available to men in facilities that had "similar custody levels, sentence structures and purposes of incarceration." *Id.* at 675; *Women Prisoners II,* 899 F.Supp. at 670–71. Specifically, the court compared the programs available to women at the Annex with those available to the men at Minimum; and it compared the programs available to women at CTF with those available to inmates at three men's prisons: the Occoquan Facility ("Occoquan"), the Central Facility ("Central"), and the Medium Facility ("Medium"). *Women Prisoners I,* 877 F.Supp. at 656, 659, 675.

Because appellants agree that Title IX applies to the educational and vocational training programs offered inmates at District prisons, we will only summarize the court's findings with respect to those programs that, in their view, lie outside the scope of Title IX.

*Work Details.* The district court described work details as "support duties needed for the running of the jail." *Id.* at 657. At the Annex, women could participate in a variety of such details, including work as receptionists, housekeepers, and librarians. *Id.* At CTF, women could choose among thirteen work details, including clerical, housekeeping, and culinary assignments. *Id.* at 661. The court found, however, that similarly situated male inmates had access to better and more numerous programs than the "stereotypical" ones available to the women. *Id.* at 677 (men at Minimum could participate in details involving carpentry, electrical, and mechanical work); *id.* at 661, 678 (men at Central could participate in such work as bricklaying, mechanics, and welding).

*Prison Industries.* "A prison industry is a business run out of a prison where goods are produced with inmate labor and then sold to government agencies." *Id.* at 657. At the Annex, women could work in a garment shop and a print shop; at Minimum, men could engage in agriculture and landscape work. *Id.* The court found that these programs were comparable and held that the women at the Annex and men at Minimum had equal access to industrial programs. *Id.* at 677. At CTF, women could participate in only one program that was "remotely" akin to a prison industry. *Id.* at 661. Because the men enjoyed access to a greater number of industries, *i.e.*, one at Occoquan, two at Medium, and ten at Central, *id.*, the court found that the women at CTF had been denied an "equivalent opportunity in the area of industries" in violation of Title IX. *Id.* at 678.

*Recreation.* At the Annex, women had access to "a recreation trailer which contains a pool table, a ping pong table, exercise bikes and a weight machine." *Id.* at 658. Furthermore, the women were escorted twice a week to recreation areas at Minimum, where they could play volleyball, basketball, and handball. *Id.* The court found that the men at Minimum had greater recreational opportunities: they had access to a gymnasium and a ball field for approximately six hours a day, Monday through Friday, as well as for three hours on several nights each week; they could use a weight trailer seven days a week; and they could participate in a variety of organized intramural team sports, as well as in a "Renaissance Drama Class." *Id.* at 658, 677.

At CTF, women could participate in scheduled recreation for an hour a day, five days a week, and had access to a gymnasium for two hours, three days a week; they were able to play basketball and volleyball in a small outside area; and they could take part in "low-impact aerobics" two days a week for an hour each day. *Id.* at 661–62. The district court found that the men had far greater opportunities for recreation. For example, the men at Central could play cards or engage in sports or other outdoor activities between 7 a.m. and 10 p.m.; those at Medium could "have recreation all day long"; and at Occo-

quan, they had between five and seven hours of recreation per day, depending on the season. *Id.*

*Religion.* While women at the Annex had "Catholic and Protestant services on a weekly basis and a Bible Study Program," *id.* at 659, the court concluded that they did not have access to the same religious activities as the men at Minimum. *Id.* at 677–78 (observing that religious services at the Annex were not as frequent as those at Minimum). The court made no findings with respect to religious programs at CTF.

### 2. Conclusions of Law

In *Women Prisoners I*, the district court found the following to be violations of federal or D.C. law: (1) sexual harassment at the Annex, CTF, and the Jail (Eighth Amendment and 42 U.S.C. § 1983), *id.* at 665–67; (2) substandard medical care at CTF (D.C.Code § 24–442), *id.* at 667–68; (3) the shackling of pregnant women (Eighth Amendment and 42 U.S.C. § 1983), *id.* at 668–69; (4) "unconstitutionally intolerable risk of injury by fire" at the Annex (Eighth Amendment and 42 U.S.C. § 1983), *id.* at 669–70; (5) inadequate fire safety measures at CTF (D.C.Code § 24–442), *id.* at 671–72; (6) intolerable living conditions at the Annex and CTF (Eighth Amendment and 42 U.S.C. § 1983), *id.* at 670–71, 672; (7) discrimination in access to programs (Title IX), *id.* at 672–78.

In *Women Prisoners II*, the district court rejected appellants' argument that it should have declined to exercise supplemental jurisdiction over the claims based on D.C.Code § 24–442. 899 F.Supp. at 665–68. The court also concluded that the discrepancy in the programs available to male and female inmates violated not only Title IX, but also equal protection principles as applied to the District through the Due Process Clause of the Fifth Amendment. *Id.* at 669–72.

### D. The District Court's Order

The Order, which is reported at *Women Prisoners I*, 877 F.Supp. at 679–90, *as amended by Women Prisoners II*, 899 F.Supp. at 677–79, contains 132 paragraphs of detailed instructions and is to remain "in

effect with all provisions for five years." ¶ 137. (The Order originally contained 138 paragraphs, but six were vacated in *Women Prisoners II.* 899 F.Supp. at 677.) The Order and its amendments are reprinted as Appendices A and B to this opinion.

The Order consists of six parts, of which the first five are relevant to this appeal:

I. *Sexual Harassment.* ¶¶ 3–19. The provisions relating to sexual harassment are multi-faceted. First, they require the DCDC to adopt a regulation that prohibits sexual harassment and invasions of female inmates' privacy. ¶¶ 3–4, 7. This regulation must provide that female inmates who allege sexual misconduct may not be subject to any disciplinary action "regardless of the merits or the disposition of the underlying complaint." ¶ 7(c). Second, the Order authorizes the district court's Special Officer to investigate allegations of sexual misconduct and to participate in the establishment of penalties for prohibited conduct. ¶¶ 5, 6, 13 (in their entirety) and ¶¶ 8, 14, 15 (in part). Third, it requires the Department to comply with its own Inmate Grievance Procedure, which establishes the mechanisms by which inmates may report misconduct by prison guards. ¶ 9. In addition, the Order directs appellants to employ "trainers" to instruct inmates and jailers about the Department's policies and regulations regarding sexual harassment and to heighten their awareness of the problem. ¶¶ 17–18, as amended.

II. *Obstetrical and Gynecological Care.* ¶¶ 20–62. Among many other things, these paragraphs require appellants to hire a half-time health educator with obstetrical and gynecological training to provide clinical and health services to the CTF population, ¶ 20, as amended; modify the intake screening of inmates and make special inquiry about their use of contraceptives and history of sexually transmitted diseases, ¶ 24; adopt written "protocols" with regard to gynecological problems and the use of restraints on pregnant and postpartum women, ¶¶ 28, 35, as amended; and develop a written protocol governing prenatal care, ¶ 36. Other provisions concern such matters as the recording of pregnancy-related statistics, ¶ 23; Pap smears, ¶¶ 30, 32; medical staff coverage,

¶¶ 44–45; emergency care, ¶ 46; and the scheduling of appointments and the transportation of inmates to the hospital, ¶¶ 49–50, as amended, ¶ 51.

III. *Program Evaluation.* ¶¶ 63–101. Part III requires appellants to improve the quality of the academic, vocational, work, recreational, and religious programs available to female inmates. Its purpose is to ensure that the women have access to the same opportunities and programs that are available to similarly situated men at other prisons.

With regard to academic programs, appellants are ordered to provide the women with greater access to adult education and college-level programs. ¶¶ 68–69, 70–71, as amended, ¶ 72. They must also make a variety of vocational, pre-vocational, and work programs available to them. ¶¶ 76–93, as amended. The Order requires appellants to provide the women at CTF with 25 hours of recreation per week, ¶ 96, as amended, and those at the Annex with access to a recreation trailer "8 hours a day, 7 days a week." ¶ 98. Appellants must also "improve the Annex grounds by adding a basketball court, volleyball pit, and outdoor tables." ¶ 99. Finally, appellants must provide chaplaincy service to female inmates five days a week, including "evening hours during the week to accommodate those women working on details, industry, or in the community." ¶ 101.

IV. *Environmental Health.* ¶¶ 102–124. Appellants are required to improve environmental health at CTF and the Annex in a variety of ways. At the outset, they are ordered to limit the number of women imprisoned at the Annex to 135. ¶ 102, as amended. They are also directed to repair the Annex's dormitory roofs, ¶ 103; provide each inmate with "at least one vertical locker and one footlocker," ¶ 105; "replace all torn mattresses and pillows," ¶ 106; "use cart liners or disposable or washable laundry bags to transport laundry," ¶ 107; and provide each double-bunk with "a minimum of 20 footcandles of prisoner-controlled light." ¶ 108. With respect to CTF, appellants are required to improve its heating and ventilation, ¶¶ 116–17, and to "monitor the food

temperature and delivery times of all foods, including special diet meals." ¶ 121.

V. FIRE SAFETY. ¶¶ 125–136. At the Annex, appellants are required to install and maintain fire alarm, fire detection, and sprinkler systems, ¶¶ 125–127; to ensure that bed linen and other dormitory materials are fire retardant, ¶ 128; and to "conduct fire drills 12 times per year, 4 times per shift, and [to] keep written documentation of all such drills." ¶ 129. At CTF, appellants must, among other things, "maintain the storage in the culinary storage room in a manner that does not prevent the sprinkler heads from functioning adequately," ¶ 134, and test the sprinkler system and fire pump and conduct fire drills on a periodic basis. ¶¶ 135, 136.

E. Appellants' Challenges

Appellants characterize the relief ordered by the district court as far broader than necessary to correct the constitutional and statutory violations that were found to exist, and they ask that we vacate specific provisions in each of the first five parts of the Order, as follows:

I. SEXUAL HARASSMENT. ¶¶ 3–19. Although appellants concede that they have failed to protect women from sexual abuse, they challenge the paragraphs that (1) authorize the Special Officer's staff to monitor sexual harassment complaints (¶¶ 5, 6, 13 (in their entirety) and 8, 12, 14, 15 (in part)); (2) require the DCDC to comply with its Inmate Grievance Procedure (¶ 9); and (3) prohibit appellants from taking any retaliatory action against inmates who file complaints, even if it is determined that the inmate's complaint was filed in bad faith (¶ 7(c)).

II. OBSTETRICAL AND GYNECOLOGICAL CARE. ¶¶ 20–62. Paragraphs 20–34 and 36–62, which require appellants to improve the quality of the obstetrical and gynecological care provided to inmates at CTF, are based on D.C.Code § 24–442. See Women Prisoners I, 877 F.Supp. at 667–68. Appellants argue that these provisions must be set aside because the district court abused its discretion in exercising supplemental jurisdiction over these local law claims. They do not challenge paragraph 35 governing the use of physical restraints on pregnant women,

which the court found to violate the Eighth Amendment.

III. PROGRAM EVALUATION. ¶¶ 63–101. These paragraphs are based on alternative grounds: (1) Title IX, which requires recipients of federal aid to provide men and women with equal access to educational programs and activities, see Women Prisoners I, 877 F.Supp. at 676–78; and (2) constitutional equal protection principles, which require that men and women who are similarly situated be treated alike, see Women Prisoners II, 899 F.Supp. at 669–72. Appellants ask that we vacate paragraphs 64–67 and 83–99 "to the extent that they affect work details, prison industries, work training, and recreation," Brief for Appellants at 37, because they contend, these activities are unrelated to academic and vocational education. They also object, as "having nothing to do with Title IX," id., provisions governing law library hours, ¶ 64; transportation of prisoners to job interviews, ¶ 93; "large group events," ¶ 97; and religious programs, ¶¶ 100–101. In addition, appellants argue that equal protection principles have no application to this case because the district court compared male and female inmates who were not similarly situated. Finally, they raise a general objection to the remedies as being far too expansive and burdensome, citing, as examples, paragraphs 71 (requiring the provision of college educations), 98 and 99 (mandating hours for the recreational trailer and the construction of basketball and volleyball facilities and picnic tables at the Annex), and 64 (requiring the coordination of the timing of activities "to maximize women prisoners' participation in as many areas as possible").

IV. ENVIRONMENTAL HEALTH. ¶¶ 102–124. Appellants challenge paragraph 102, as amended, which imposes a population cap at the Annex. They argue that it is not warranted and encroaches on their ability to incarcerate convicts. They also make vague challenges to the other paragraphs in this section, contending that they are overbroad and unduly intrusive.

V. FIRE SAFETY. ¶¶ 125–136. These paragraphs address the court's findings of

violations of the Eighth Amendment at the Annex, and of D.C.Code § 24–442 at CTF. *See Women Prisoners I,* 877 F.Supp. at 669–70, 671–72. Appellants challenge those relating to CTF (¶¶ 133–136), contending that the district court abused its discretion in exercising supplemental jurisdiction over claims arising under that section.

## F. The Prison Litigation Reform Act of 1995

On April 25, 1996, following oral argument in this appeal, the Prison Litigation Reform Act of 1995 ("PLRA" or "Act") became effective. The reforms were enacted as Title VIII, sections 801 and 802 of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1996, Pub.L. No. 104–134, Stat. (Apr. 26, 1996). The Act amends 18 U.S.C. § 3626, which is now entitled "Appropriate remedies with respect to prison conditions." It governs all civil litigation, whether in a federal or state court, with respect to conditions in a federal, state, or local prison that are alleged to violate a federal right. 18 U.S.C. § 3626(a)(1)(A), (d), and (g)(2) and (5). It applies to pending cases such as this one. *Id.* § 3626(b)(1)(A)(iii) & (b)(2).

In supplemental briefs submitted by the parties, appellants argue that the Act has invalidated the great majority of the paragraphs in the Order. Specifically, they maintain that the PLRA (1) denies federal courts the authority to order prospective relief to correct violations of local law; (2) precludes the assigning of non-judicial functions to a court-appointed special officer; (3) prohibits the award of relief that is not "narrowly drawn"; and (4) strips federal courts of the power to impose population caps on prisons except under circumstances that are not satisfied here.

In response, appellees question appellants' construction of the PLRA and raise a number of constitutional and other challenges to the Act. They also note that they had originally alleged that the inadequate medical care and fire safety provided the female inmates at CTF violated both D.C.Code § 24–442 and the Eighth Amendment. Therefore, if we should find that the Act divested the district court of its supplemental jurisdiction over the section 24–442 claims, they ask that we remand those issues so that the court may consider the constitutional questions previously reserved.

We will not address appellees' objections to the Act for two reasons: First, we are able to dispose of the majority of appellants' challenges on the basis of pre-PLRA law. Second, because the new statute may be dispositive of the remaining challenges and may provide the basis for new ones, we will remand the provisions we do not vacate so that the district court may review them in light of the PLRA. Appellees will be free, at that time, to bring their various challenges to the Act and to renew their Eighth Amendment claims with respect to medical care and fire safety at CTF.

## II. DISCUSSION

 As a preliminary matter, we think it appropriate to emphasize that federal courts must move with caution when called upon to deal with even serious violations of the law by local prison officials. As the Supreme Court observed in *Missouri v. Jenkins,* 495 U.S. 33, 51, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990), "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." This respect for local authorities is at its zenith in the context of prison reform litigation:

> "[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism."

*Rhodes v. Chapman,* 452 U.S. 337, 351 n. 16, 101 S.Ct. 2392, 2401 n. 16, 69 L.Ed.2d 59 (1981) (quoting *Procunier v. Martinez,* 416

U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)). *See also Bell v. Wolfish,* 441 U.S. 520, 548, 99 S.Ct. 1861, 1879, 60 L.Ed.2d 447 (1979) ("the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial"); *Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973) ("It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.").

Only weeks ago the Supreme Court reversed a district court order that had mandated detailed, system-wide changes in Arizona's prison law libraries. *Lewis v. Casey,* —— U.S. ——, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Writing for the majority, Justice Scalia observed that, in *Preiser,* the Court had held that "considerations of comity ... require giving the States the first opportunity to correct errors made in the internal administration of their prisons," and that the district court in *Lewis* had "totally failed to heed the admonition of *Preiser.*" —— U.S. at ——, 116 S.Ct. at 2186 (internal quotation marks and citation omitted).

A. Supplemental Jurisdiction

The district court concluded that the DCDC had failed to provide adequate medical care and fire safety at CTF in violation of D.C. law, which provides that the Department

shall have charge of the management and regulation of [D.C. prisons], and be responsible for the safekeeping, care, protection, instruction, and discipline of all persons committed to such institutions.

D.C.Code § 24–442. Of the Order's 132 paragraphs, roughly one-third are intended to remedy violations of this section. *See Women Prisoners I,* 877 F.Supp. at 667–68, 671–72; Order at ¶¶ 20–34; 36–62; 131–32 (to the extent that they relate to CTF); 133–36. Appellants argue that the district court's exercise of jurisdiction over these D.C.Code claims violated the supplemental jurisdiction provisions of the Judicial Improvements Act of 1990, 28 U.S.C. § 1367 (1994).

■■■■ When a federal court has an independent basis for exercising federal jurisdiction, it may, in certain circumstances, also exercise pendent, or supplemental, jurisdiction over related claims under state law. In *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court crafted a two-part test to determine when the assertion of jurisdiction over a state law claim is appropriate. First, the district court must determine whether the state and the federal claims "derive from a common nucleus of operative fact"; if they do, the court has the *power,* under Article III of the Constitution, to hear the state claim. *Id.* at 725, 86 S.Ct. at 1138. Second, even if it concludes that it has that power, the district court must then decide whether to exercise its *discretion* to assert jurisdiction over the state issue. *Id.* at 726, 86 S.Ct. at 1139. The Supreme Court cautioned that

pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims .... Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.

*Id.* A district court's decision to resolve state law claims is reviewed for an abuse of discretion. *Edmondson & Gallagher v. Alban Towers Tenants Ass'n,* 48 F.3d 1260, 1265–66 (D.C.Cir.1995).

In 1990, Congress enacted the supplemental jurisdiction statute, which provides in relevant part:

(a) Except as provided in subsections (b) and (c) ..., in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution ....

\* \* \* \* \* \*

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

\* \* \* \* \* \*

(e) As used in this section, the term "State" includes the District of Columbia
. . . .

28 U.S.C. § 1367. As we observed in *Diven v. Amalgamated Transit Union International and Local 689,* 38 F.3d 598, 601 (D.C.Cir. 1994), the extent to which section 1367(c) has modified the district's court's discretion to hear claims under local law is a matter of some dispute. In *Diven,* we rejected the argument that section 1367 had restricted the district court's discretion to decline to exercise supplemental jurisdiction, *see id.*; and we have since stated that section 1367(c) "essentially codifies [*Gibbs*]," *Edmondson & Gallagher,* 48 F.3d at 1266.

▮ Here, the district court clearly had the power to consider appellees' local claims under section 24–442. Their claims under the Fifth and Eighth Amendments and Title IX were substantial enough to confer subject matter jurisdiction on the court, *see Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138; and the local law claims, relating to the adequacy of the medical care and fire safety at CTF, arose from a "common nucleus of operative facts" as the federal claims; namely, the District's decision to re-assume custody of its female prisoners and its alleged failure to provide for their needs. The question before us, then, is whether the court abused its discretion in exercising jurisdiction over the local claims.

The supplemental jurisdiction statute provides that district courts may decline jurisdiction over claims that "raise[ ] a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). Appellants argued below, and renew their argument on appeal, that the novelty of appellees' request for equitable relief based on section 24–442 precluded the exercise of supplemental jurisdiction. Specifically, they contend that the section merely extends the common law of torts to local prisons. *See, e.g., District of Columbia v. Mitchell,* 533 A.2d 629, 639 (D.C.1987). *See also Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988); *Hughes v. District of Columbia,* 425 A.2d 1299, 1302 (D.C.1981); *Gaither v. District of Columbia,* 333 A.2d 57, 60 (D.C.1975). Appellants point out that the statute has been relied upon by inmates suing for monetary damages and that D.C. courts have applied ordinary tort principles to those cases. *See, e.g., Mitchell,* 533 A.2d at 633; *Matthews v. District of Columbia,* 387 A.2d 731, 732 (D.C.1978). Furthermore, appellants observe that the District of Columbia Court of Appeals has relied upon cases in other jurisdictions that have held that similar laws simply permit a common law tort action for inmate claims against prison officials. *See Gaither,* 333 A.2d at 60 (citing *Justice v. Rose,* 102 Ohio App. 482, 144 N.E.2d 303, 305 (1957) (Ohio statute is "simply declaratory of the common law")). Finally, appellants note that the statute has never been interpreted to allow inmates to seek injunctive relief such as that granted here.

▮ The district court rejected appellants' arguments and concluded that the award of injunctive relief under section 24–442 did not raise a novel issue of local law. It stated that "[t]he exercise of injunctive relief ... is an unexceptionable feature of the common law." *Women Prisoners II,* 899 F.Supp. at 668. We respectfully disagree with the district court's analysis. While it is true, of course, that the common law recognized the propriety of injunctive relief in certain instances, it was never regarded as relief of first resort; indeed, in tort actions, the standard formulation of the common law on this point is that equitable relief, such as an injunction, will be granted only when plain-

tiff's legal remedies are inadequate. *See* John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 218, at 369 (5th ed.1941); William Q. de Funiak, *Handbook of Modern Equity* § 18, at 32 (2d ed.1956). Furthermore, courts have long stated that a variety of factors, including the public interest, may weigh against the award of an injunction. *See Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1933); *Blair v. Freeman*, 370 F.2d 229, 239 (D.C.Cir.1966).

We think it significant that we can find no case in which a D.C. court has awarded injunctive relief under section 24–442; nor are we aware of any case in which injunctive relief was sought under this section of the D.C.Code, even though the inmates of D.C. prisons are no strangers to the judicial system and have frequently sought injunctive relief in both the D.C. and federal courts. In the last major prisoners' class action to come before us involving allegations of, *inter alia,* inadequate medical care and fire safety, the claims were pled solely as Eighth Amendment violations. *See Inmates of Occoquan v. Barry*, 844 F.2d 828, 829 (D.C.Cir.1988) ("*Occoquan*"). No one seized upon the "unexceptionable" idea of seeking alternative injunctive relief under section 24–442.

■ The Supreme Court has counseled that "the proper function of [a] federal court is to ascertain what the state law is, not what it ought to be," *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941); and we have observed that "a federal court should be reluctant to retain pendent jurisdiction over a question for which state jurisprudence gives inadequate guidance." *Financial General Bankshares, Inc. v. Metzger*, 680 F.2d 768, 776 (D.C.Cir.1982). Thus, while we will generally defer to a district court's decision to assert supplemental jurisdiction, that deference is not boundless. In *Metzger* and *Doe v. Board on Professional Responsibility of the District of Columbia Court of Appeals,* 717 F.2d 1424 (D.C.Cir.1983), we held that the district court had abused its discretion in deciding pendent claims when the local law was unsettled. We noted that "'[a]lthough the District Court devoted considerable time,

effort and care to these questions, in a completely unsettled area of local law a federal District Court opinion is no substitute for an authoritative decision by the courts of the District of Columbia.'" *Doe*, 717 F.2d at 1428–29 (quoting *Metzger*, 680 F.2d at 778). *See also Grano v. Barry*, 733 F.2d 164, 169 (D.C.Cir.1984) (because, among other factors, the case involved an unsettled issue of local law, "[a]ppellees' remedy, if any, lies in the courts of the District of Columbia"); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir.1995) (under section 1367(c), state "courts are the appropriate forum to decide [a] novel and complex issue of state law"); *Lyon v. Whisman,* 45 F.3d 758, 760 n. 4 (3d Cir.1995) (section 1367(c) "counsels against the exercise of jurisdiction when 'the claim raises a novel or complex issue of State law'").

Our dissenting colleague contends that "[w]hatever other objections might be raised to the district court's enforcement of local law in this case, ... it cannot be said that the court's action was novel. *See Campbell v. McGruder*, 416 F.Supp. 100, 105 (D.D.C. 1975) (for constitutional violation, imposing mandatory injunction that in part required local agencies to remedy violations of local fire, building, housing, health, and food regulations at D.C. Jail) ..." Dissent at 948. In other words, the dissent contends that in *Campbell* the district court had awarded equitable relief to remedy a local law violation, and therefore the district court's action in this case has a precedent. With all respect, we think this distorts the holding in *Campbell*. There, the district court found that prison conditions violated the Eighth Amendment; to remedy these *constitutional* violations, the district court ordered the District to comply with local law provisions. *See Campbell*, 416 F.Supp. at 105. Here, the district court suggested that the medical care at CTF *might* rise to the level of an Eighth Amendment violation, *see Women Prisoners II*, 899 F.Supp. at 667; nevertheless, it expressly declined to decide the issue on constitutional grounds. *See Women Prisoners I*, 877 F.Supp. at 667 n.42.

Furthermore, the dissent mischaracterizes our holding when it states that "[t]he judges

of the Superior Court of the District of Columbia would ... be ... surprised ... to hear it suggested that they lacked the authority to impose appropriate injunctive relief in the face of ongoing institutional failure to meet a legal duty of care." Dissent at 948 n.5. Plainly, local courts are free to interpret section 24–442 as authorizing injunctive relief. We simply repeat our earlier point: they never have. The dissent is quite confident that the local courts would so interpret this statute; we confess to being impressed by the fact that they have never done so.

The intrusiveness of the relief sought also weighs against the exercise of pendent jurisdiction. *See* 28 U.S.C. § 1367(c)(4) (district court may decline to exercise supplemental jurisdiction when "in exceptional circumstances, there are other compelling reasons for declining jurisdiction"). The section of the Order relating to medical care at CTF is a case study in the judicial micromanagement of a local prison system. The Order requires appellants, *inter alia,* to hire a nurse midwife to provide additional services to the female inmates (¶ 20, as amended), establish a prenatal clinic (¶ 22), maintain statistics on the number of pregnancies and "birth outcomes" (¶ 23), develop and implement detailed protocols concerning the care for a variety of diseases (¶ 28), develop protocols providing guidelines for high-risk pregnancies involving women with histories of alcohol and drug abuse and venereal diseases (¶ 36), arrange for obstetrical examinations of pregnant women in accordance with a detailed schedule (¶ 37), implement "an obstetrical and gynecological health education program that satisfies a recognized national medical standard" (¶ 43, as amended), and ensure that female inmates are transported to the hospital, even for routine procedures, "no more than 2 hours before the scheduled time of their appointment" (¶ 50, as amended).

These may all be highly desirable measures, but the Supreme Court has repeatedly warned against such detailed marching orders. *See, e.g., Lewis,* —— U.S. at ——, 116 S.Ct. at 2186. In *Grano,* as in this case, the district court applied a D.C. statute in a novel way to assume control over local politi-

cal processes. We dissolved the injunction, explaining:

> In general, principles of comity and the desirability of a surer-footed reading of applicable law support the determination of state claims in state court. Determination by the state court is especially important where the case involves novel and unsettled issues of state law. Here, the law in question is new, its meaning ambiguous and sharply disputed. *Moreover, the district court should not retain jurisdiction because this case directly implicates the processes by which a locality governs itself.* Appellees' remedy, if any, lies in the courts of the District of Columbia.

733 F.2d at 169 (emphasis added) (citation and internal quotation marks omitted).

By its plain terms, section 24–442 simply requires the District's jailers to exercise reasonable care in discharging their duties. The district court and dissent would read this bland codification of tort principles to empower federal courts to usurp control over fire safety and medical care at local prisons. There can, of course, be no limiting principle here. Issues relating to security, sanitation, food preparation, ventilation, etc., will all come within the court's authority. We wonder whether the lawmakers who enacted section 24–442 intended to transfer control over the District's prisons to the courts (or, more likely, a small cadre of court-appointed special officers). If this be the import of section 24–442, let the District's courts proclaim it.

Because it is not settled that section 24–442 authorizes injunctive relief, and because federal courts are obliged to exercise restraint in the extraordinary circumstances posed by prison litigation of this nature, we hold that the district court abused its discretion in exercising jurisdiction over these local claims in violation of the supplemental jurisdiction statute and the well-established principles that it has codified. We therefore vacate ¶¶ 20–34, 36–62; 131–32 (to the extent that they relate to CTF); and 133–36.

## B. The Programs

The district court found that female inmates at CTF and the Annex had not received the same access to academic, vocation-

al, work, recreational, and religious programs that were available to similarly situated men at other prisons. In its original opinion, the court held that this violated Title IX. *Women Prisoners I,* 877 F.Supp. at 672–78. In *Women Prisoners II,* 899 F.Supp. at 669–72, the court concluded that the unequal access to programs also violated the equal protection principles of the Constitution. Part III of the Order requires appellants to improve the quantity and quality of these programs at CTF and the Annex, *see* ¶¶ 63–101; it also requires appellants to increase the women's access to a law library (¶ 64) and "group events" (¶ 97) and to transport them to job interviews (¶ 93).

Appellants do not challenge the provisions that relate to educational (academic and vocational) programs. They ask us, however, to vacate those paragraphs of the Order (¶¶ 83–101, in their entirety, and ¶¶ 64–67, in part) that require them to upgrade the work, recreational, and religious programs available to female inmates, and that relate to law library hours, group events, and transportation to job interviews. They argue, first, that those prison activities are not "educational" and, as a consequence, are not subject to Title IX; second, they assert that the district court's equal protection analysis is fundamentally flawed because the women at the Annex and CTF are not similarly situated to the men at the other facilities. We address the latter argument first because the district court's Title IX and equal protection analyses are both predicated on its conclusion that the respective prison populations were similarly situated. See *Women Prisoners I,* 877 F.Supp. at 675–76; *Women Prisoners II,* 899 F.Supp. at 670–71.

 The Fourteenth Amendment's Equal Protection Clause requires States to treat similarly situated persons alike. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). The District of Columbia is subject to that requirement by virtue of the Fifth Amendment's guarantee of due process of law. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954); *Family Division Trial Lawyers of the Superior Court–D.C., Inc. v. Moultrie,*

725 F.2d 695, 697 n. 1 (D.C.Cir.1984). The Constitution, however, " 'does not require things which are different in fact or opinion to be treated in law as though they were the same.' " *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (quoting *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940)); *accord Michael M. v. Superior Court,* 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981). Thus, the "[d]issimilar treatment of dissimilarly situated persons does not violate equal protection." *Klinger v. Department of Corrections,* 31 F.3d 727, 731 (8th Cir.1994) (*"Klinger I"*). The threshold inquiry in evaluating an equal protection claim is, therefore, "to determine whether a person is similarly situated to those persons who allegedly received favorable treatment." *United States v. Whiton,* 48 F.3d 356, 358 (8th Cir.1995). We believe the same principle should apply in Title IX cases. *See Klinger v. Nebraska Dep't of Correctional Services,* 887 F.Supp. 1281, 1286–87 (D.Neb.1995) (*"Klinger II"*).

 In reviewing the district court's conclusions, we begin, as indicated above, by addressing its assumption that the prisoners at the several facilities were similarly situated "by virtue of their similar custody levels, sentence structures and purposes of incarceration." *Women Prisoners I,* 877 F.Supp. at 675. Appellants argue that these are only three of a number of factors that must be considered when determining whether two groups of inmates are sufficiently similarly situated to render meaningful a comparison of the programs available to each.

Two recent cases are instructive in this regard. In *Klinger I,* the Eighth Circuit observed that prison officials

> must balance many considerations, ranging from the characteristics of the inmates at that prison to the size of the institution, to determine the optimal mix of programs and services. *See Turner [v. Safley],* 482 U.S. [78] at 84–85 [107 S.Ct. 2254, 2259–60, 96 L.Ed.2d 64 (1987)]. Program priorities thus differ from prison to prison, depending on innumerable variables that officials must take into account.

31 F.3d at 732. A later case, *Pargo v. Elliott,* 894 F.Supp. 1243, 1254–62 (S.D.Iowa

1995), *aff'd,* 69 F.3d 280 (8th Cir.1995), *pet. for cert. filed* (Apr. 8, 1996) (No. 95–8906), illustrates the variables that must be taken into consideration. In concluding that the female inmates were not similarly situated to the male inmates with whom they sought to be compared, the district court in *Pargo* placed particular stress on five factors: population size of the prison, security level, types of crimes, length of sentence, and special characteristics. 894 F.Supp. at 1259–61. *See also* testimony of Regina Gilmore, Acting Female Program Coordinator at DCDC, at Tr. IX–5–6, and of Dr. T.A. Ryan, expert witness, at Tr. XI–38–39 (programming needs of inmates are gauged by their classification, which takes the following factors into account: custody level; medical, educational, and employment histories; substance abuse information; impending factors relating to pre-release; results of psychological testing; social services reports; and security risks).

Here, the district court acknowledged that 82 percent of women incarcerated in the facilities operated by the District were single-parent primary caretakers, and that only seven percent were serving sentences for violent crimes. *Women Prisoners I,* 877 F.Supp. at 656. It failed, however, to make any findings regarding the types of crimes for which male inmates had been convicted, or other "special characteristics" of male inmates. *Compare with Pargo,* 894 F.Supp. at 1254–57 (addressing the "types of crimes" and "special characteristics" of male inmates before drawing comparison to the female inmates). Nor did it take into account the striking disparities between the sizes of the prison populations that were being compared.

The district court found that the female inmates at the Annex were similarly situated to the men at Minimum. *Women Prisoners I,* 877 F.Supp. at 656; *Women Prisoners II,* 899 F.Supp. at 670. Yet Minimum had a population of 936 prisoners in contrast to the 167 at the Annex. *Women Prisoners I,* 877 F.Supp. at 656. It is hardly surprising, let alone evidence of discrimination, that the smaller correctional facility offered fewer programs than the larger one. We doubt, for example, that tuition-paying parents who entrust their daughters to the all-women

Smith College in Northampton, Massachusetts, would raise an eyebrow (let alone accuse the college of sex discrimination) on learning that Smith offers its 2,800 students approximately 1,000 courses while Harvard University provides its 6,600 undergraduates with three times as many.

Even if the women at the Annex had access to a third or half the number of work and religious programs as the men at Minimum, because of the six-to-one difference in their respective populations, on a per inmate basis, the women had access to two or three times the number of programs as did the men. *Cf. Jeldness v. Pearce,* 30 F.3d 1220, 1233 (9th Cir.1994) (Kleinfeld, J., dissenting) (while female inmates have access to fewer total number of programs, "[t]he women's prison has almost 2½ times as many [programs] per prisoner as the most generous male prison"). We do not suggest that these mechanical ratios are a test of comparability; merely that, standing alone, the difference in the number of programs provided by prisons having vastly different numbers of inmates cannot be taken as evidence that those in small institutions that offer fewer programs have been denied equal protection. More than that is required.

As regards the women at CTF, the district court found that they were similarly situated to male inmates at the Occoquan, Central, and Medium facilities. *Women Prisoners I,* 877 F.Supp. at 659; *Women Prisoners II,* 899 F.Supp. at 671. While CTF is an 800–bed facility, and thus arguably comparable in size to Central (1,373 inmates), Medium (1,016 inmates), and Occoquan (1,767 inmates), the female inmates at CTF number only 271. The district court specifically rejected a comparison of CTF men with its women because the "men reside at CTF for either short-term diagnostic attention or a voluntary 18–month intensive substance abuse program." *Women Prisoners I,* 877 F.Supp. at 675. We note, however, that somewhere between 35 percent and 50 percent of the women at CTF are serving sentences of less than two years, and the vast majority of the remaining women are serving sentences of between two and four years. *Id.* at 675 n. 50. In other words, the women

at CTF, like the men, are not being incarcerated there for an extended period of time. The district court failed to make *any* findings regarding the programs available to male inmates at CTF, and there is thus no evidence that they enjoy access to more fulfilling opportunities than the women. The female inmates at CTF are, therefore, foreclosed from making an equal protection challenge.

The dissent contends that our analysis errs because we have ignored "how the prisoners came to be segregated," with women typically assigned to smaller prisons than the men. Dissent at 952. As an initial matter, we note that the segregation of inmates by sex is unquestionably constitutional. *See Pitts v. Thornburgh,* 866 F.2d 1450 (D.C.Cir. 1989). The District's decision to imprison women in smaller facilities than the typical male prison is the obvious result of an undisputed fact: there are far fewer female inmates. As of January 1994, the total number of female inmates incarcerated in all of the District's jails was 606; this is considerably less than the total population at the smallest male facility (Minimum, pop. 936) discussed in this case. It would be difficult for one facility to house all these female inmates because they range from minimum to maximum custody, from those awaiting immediate release to those serving long sentences.

Furthermore, our decision here is altogether consistent with the Supreme Court's most recent articulation of equal protection principles in *United States v. Virginia,* ⸺ U.S. ⸺, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (*"VMI"*). In *VMI,* the Supreme Court compared the programs available at the all-female Mary Baldwin College, where the Virginia Women's Institute for Leadership ("VMIL") is located, with the programs available at the all-male Virginia Military Institute ("VMI"). The enrollment at Mary Baldwin College is 1,327 students, of whom 650 actually live on the campus, *United States v. Commonwealth of Virginia,* 852 F.Supp. 471, 500, 501 (W.D.Va.1994); the enrollment at VMI is 1,124, *United States v. Commonwealth of Virginia,* 766 F.Supp. 1407, 1419 (W.D.Va.1991). Despite their comparable

sizes, the two colleges offered vastly different educational and athletic programming. The Court noted:

> Mary Baldwin does not offer a VMIL student the range of curricular choices available to a VMI cadet. VMI awards baccalaureate degrees in liberal arts, biology, chemistry, civil engineering, electrical and computer engineering, and mechanical engineering. VMIL students attend a school "that does not have a math and science focus"; they cannot take at Mary Baldwin any courses in engineering or the advanced math and physics courses VMI offers.

*VMI,* ⸺ U.S. at ⸺, 116 S.Ct. at 2284 (citations omitted).

In addition, the Court noted the extreme discrepancy in the financial resources available to Mary Baldwin and VMI. *Id.* at ⸺, 116 S.Ct. at 2285. Here, while appellees have alleged that the District provides inferior programs, they have not alleged that the District allocates fewer resources per female inmate, nor was any evidence apparently introduced at trial to that effect. Appellees' claim, therefore, would appear to be that appellants have mismanaged the resources allocated to female inmates by failing to provide them with the identical programs offered to the men. In effect, appellees are inviting this court to find that the District's decision to provide male (but not female) inmates with access to any given program violates equal protection principles.

We decline this invitation. While certain programs (such as a work detail in auto mechanics) may be available only to male inmates, other programs (such as a life skills class) may be available only to female inmates. Under the program-by-program method of comparison embraced by the dissent, any divergence from an identity of programs gives rise to equal protection liability. Thus, if male inmates have access to a work detail that is unavailable to women, that violates equal protection. If men can spend an extra hour a day in a gymnasium, that violates equal protection. Conversely, if women had access to a parenting class unavailable to men, that violates equal protection. Such an approach completely eviscerates the deference that federal courts are obliged to give

prison administrators. *See Turner,* 482 U.S. at 84–85, 89, 107 S.Ct. at 2259–60, 2261. As the Eighth Circuit has observed,

> as between any two prisons, there will always be stark differences in programming. Assuming that all prisons start with adequate yet limited funding—as we must here, because plaintiffs do not claim that [the correctional facility] is subject to discriminatory funding—officials will calibrate programming needs differently in each prison, emphasizing in one prison programs that they de-emphasize in others. Thus, female inmates always can point out ways in which male prisons are "better" than theirs, just as male inmates can point out *other* ways in which female prisons are "better" than theirs.

*Klinger,* 31 F.3d at 732.

Finally, we note that an inmate has no constitutional right to work and educational opportunities. *Inmates of Occoquan v. Barry,* 844 F.2d 828, 836 (D.C.Cir.1988). While an inmate has a limited right to exercise, this right is violated only if "movement is denied and muscles allowed to atrophy, [or] the health of the individual is threatened." *French v. Owens,* 777 F.2d 1250, 1255 (7th Cir.1985). In and of itself, idleness does not violate the Eighth Amendment protection against cruel and unusual punishment; indeed, idleness does not even constitute "punishment." *See Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400. Thus, the District could, entirely consistent with the Constitution, deprive male and female inmates of virtually all of the programs they now enjoy. If federal courts could find equal protection liability whenever male and female inmates have access to different sets of programs, budget-strapped prison administrators may well respond by reducing, to a constitutional minimum, the number of programs offered to all inmates. As the *Klinger* court observed,

> prison officials would be far less willing to experiment and innovate with programs at an individual institution knowing that a federal court could impose liability on the basis of a program [by program] comparison. Indeed, inmates would suffer because officials would likely provide each institution with the bare constitutional minimum

of programs and services to avoid the threat of equal protection liability.

*Klinger,* 31 F.3d at 733.

Given these significant differences in the situations of the women at the Annex and CTF and those of the men at the facilities with which the court compared them, and given the fact that the court's Title IX and equal protection analyses both depend on findings that they were similarly situated, we need not examine the programs themselves in order to vacate the program-related provisions that appellants have challenged. But even though we do not address the scope of Title IX in the prison context, we admit to grave problems with the proposition that work details, prison industries, recreation, and religious services and counseling have anything in common with the equality of *educational* opportunities with which Title IX is concerned. We therefore vacate ¶¶ 83–101 in their entirety and ¶¶ 64–67 to the extent that they do not relate to educational programs.

## C. Eighth Amendment

The district court concluded that the following conditions violated the Eighth Amendment guarantee against cruel and unusual punishment: (1) the pattern of sexual harassment at the Annex, CTF, and the Jail, *Women Prisoners I,* 877 F.Supp. at 664–66; (2) the use of physical restraints on women in their third trimester of pregnancy, *id.* at 668;(3) the general living conditions at both CTF and the Annex, *id.* at 670–71, 672; and (4) the inadequacy of the provisions for fire safety at the Annex, *id.* at 669–70. The Order addresses each of these perceived violations. *See* ¶¶ 3–19 (sexual harassment), ¶ 35 (physical restraints on pregnant women), ¶¶ 102–124 (general living conditions at CTF and the Annex), and ¶¶ 125–132 (fire hazards at the Annex). (The court had originally concluded that the "lack of child visitation and inadequate child placement counseling at CTF" violated the Eighth Amendment, *id.* at 669, but it later reversed itself and vacated the relevant paragraphs (39–42) of the Order, *Women Prisoners II,* 899 F.Supp. at 674–75.)

■ The Supreme Court has concluded that prison conditions are subject to Eighth Amendment scrutiny. *See Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993). "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989). The Supreme Court has rejected a claim that the double-celling of inmates had violated the Eighth Amendment, noting that the practice "did not lead to deprivations of essential food, medical care, or sanitation[,] [n]or did it increase violence among inmates or create other conditions intolerable for prison confinement." *Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400. Relying on the Court's decision in *Rhodes,* we have stated that *"the 'deprivations' that trigger Eighth Amendment scrutiny are deprivations of essential human needs." Occoquan,* 844 F.2d at 836 (citing *Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400) (emphasis in original).

We made a further point in *Occoquan,* namely, that "once a right [under the Eighth Amendment] is established, the remedy chosen must be tailored to fit the violation." 844 F.2d at 841. Appellants have not challenged the district court's findings that the sexual harassment, living conditions, and fire hazards rise to the level of violations of the Eighth Amendment; rather, they assert that certain of the district court's prescriptions go beyond what is required to satisfy "the minimal civilized measure of life's necessities," *id.* at 839, and instead reflect an impermissible effort to transform prisons into "better places." They also complain that the court's mandates are generally far broader than necessary to correct the constitutional violations that the court found to exist.

Because appellants have chosen not to contest the court's conclusions that they had violated the Eighth Amendment in these several ways, our review is limited to an examination of the propriety of the remedies that appellants have challenged. We discuss these alleged violations in turn.

1. *Living Conditions at the Annex*

■ The district court observed that environmental health experts retained by both parties agreed that the Annex dormitories are overcrowded. *Women Prisoners I,* 877 F.Supp. at 651 & n. 22. The court found that this overcrowding "creates a shortage of sanitary facilities," as measured by the standards established by the American Correctional Association ("ACA"), *id.* at 651–52 & n. 23; "increases the spread of infectious disease, produces a . . . noise level [in excess of the ACA standard of acceptability]," *id.* at 652 & n. 24 (citations to record omitted); and "creates filthy living conditions, such as dirty floors and moldy bathrooms," *id.* at 652. In discussing the general conditions at the Annex, which included many deficiencies beyond those it had identified as having resulted from overcrowding, the court found that the living conditions were "cruel and unusual because they combine to create an unconstitutionally high exposure to illness or injury." *Id.* at 670.

This case finds a close parallel in *Inmates of Occoquan v. Barry,* 650 F.Supp. 619 (D.D.C.1986). There, the district court imposed a population cap because it believed that the crowded conditions at the prison increased the risk of disease and produced unacceptable noise levels. *Id.* at 621, 634. In reversing the district court, we stated that "an approach commensurate with Supreme Court precedent would have sought to identify the conditions causing the constitutional violation and order those conditions remedied." *Occoquan,* 844 F.2d at 842. Characterizing a population cap as a "last resort" remedy, *id.* at 843, we explained that

a population limit, or put another way, a minimum square footage requirement, directly implicates decisions with which the political process is charged. Such fundamental decisions as how many prisons to build and how large to build them—basic decisions regarding the allocation of public resources—are simply outside the domain of federal courts.

*Id.* at 842–43.

■ The principal lesson to be drawn from *Occoquan* is the following: when prison

conditions are so "soul-chilling," *Rhodes,* 452 U.S. at 354, 101 S.Ct. at 2403 (Brennan, J., concurring), that they implicate the Eighth Amendment, a district court is empowered to order relief that is specifically tailored to address the violations the court has identified. For example, if ventilation is found to be grossly wanting, an instruction to improve air quality is the appropriate remedy. Indeed, in this case many of the environmental problems that, taken together, the court found "to raise the risk of illness and injury to a constitutionally unacceptable level," *Women Prisoners I,* 877 F.Supp. at 670, are addressed in other parts of the Order. *See, e.g.,* ¶ 104 (ordering a vermin-eradication program); ¶ 112 (ordering improvement of ventilating system); ¶ 113 (ordering installation of drainage system to prevent hazardous accumulations of water); ¶ 123, as amended (ordering inspection and prompt repair of plumbing fixtures). The court, therefore, should have determined the constitutional propriety of a population cap *at the margin*—that is to say, after its instructions concerning health and safety measures had been complied with.

> The Supreme Court has counseled that [t]he Constitution ... "does not mandate comfortable prisons," and only those deprivations denying the "minimal civilized measures of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation.

*Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (construing and quoting *Rhodes,* 452 U.S. at 349, 347, 101 S.Ct. at 2400, 2399) (internal citations omitted). This suggests that standards that the ACA finds "unacceptable" may nonetheless be constitutional. To the extent that conditions at the Annex "are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. Keeping in mind that the Order includes other provisions dealing with the hazards that it had identified as being a product of overcrowding, we see nothing in the population density itself that can clearly be described as depriving the inmates "of the minimal civilized measures of life's necessi-

ties." *Occoquan,* 844 F.2d at 839 (internal quotation marks omitted). We therefore vacate paragraph 102.

### 2. *Sexual Harassment*

The Supreme Court has stated that "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994) (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399). In this case, the district court found that the pattern of sexual assaults on female inmates, especially when coupled with inappropriate remarks by DCDC employees and invasions of the inmates' privacy, rose to the level of objective cruelty that violated the Eighth Amendment. *Women Prisoners I,* 877 F.Supp. at 664–66. The court specifically found a pattern of "deliberate indifference" to sexual harassment at the three facilities. *Id.* at 665. Part I of the Order is intended to cure these violations by requiring appellants, in manifold ways, to eliminate incidents of sexual misconduct and to improve the Department's response to those incidents that nonetheless occur. *See* ¶¶ 3–19. Appellants challenge three aspects of the prescribed remedies.

 *Special Officer.* Paragraph 5 of the Order directs that one or more members of the staff of the district court's Special Officer "monitor allegations of sexual harassment at each facility in which women prisoners are housed." Paragraph 8 requires that the DCDC *and* the Special Officer establish penalties for conduct prohibited by the Department's policy on sexual harassment. Finally, paragraph 13 provides:

> The monitor(s) shall ensure that each reported violation of the policy is thoroughly investigated and documented. The monitor(s) shall submit a final written report to the Warden of the institution; the report shall include factual findings and a conclusion as to whether a preponderance of evidence shows that a violation of the sexual harassment policy occurred. Within 48 hours after the Warden receives the monitor(s)' report, the Defendants shall inform the complaining woman prisoner, in writ-

ing, of the outcome of the investigation. The Warden shall take appropriate action as detailed in the schedule of penalties.

Appellants argue that it was an abuse of discretion for the district court to direct its Special Officer to perform the non-judicial, local government function of investigating complaints of sexual harassment, citing *Missouri v. Jenkins,* 495 U.S. 33, 51, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990) ("one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions").

Appellees respond by likening the powers of the Special Officer and her monitors to that of a special master, as contemplated by Rule 53 of the Federal Rules of Civil Procedure. This analogy strikes us as inexact. In unusual circumstances, *see* Fed.R.Civ.P. 53(b) ("[a] reference to a [special] master shall be the exception and not the rule"), the appointment of a special master may be useful to oversee compliance with a court order. *See National Organization for the Reform of Marijuana Laws v. Mullen,* 828 F.2d 536, 544–45 (9th Cir.1987) ("*NORML*") (approving use of monitors to oversee compliance with court order where compliance with past orders has been sporadic); *Ruiz v. Estelle,* 679 F.2d 1115, 1159–63 (5th Cir.1982) (same), *vacated in part on other grounds,* 688 F.2d 266 (5th Cir.1982). Nevertheless, the master's role in such cases has been limited. As the Ninth Circuit noted in approving the use of monitors in a prison reform case,

> [t]he Special Master has no authority to interfere with the operation of the City's jails. The district court appointed the Special Master to investigate, report, and recommend actions that the City could take to ensure compliance with the consent decree. The City agreed to his appointment.

*Stone v. City and County of San Francisco,* 968 F.2d 850, 859 n. 18 (9th Cir.1992). *See also NORML,* 828 F.2d at 545 ("Masters may not be placed in *control* of government defendants for the purpose of forcing them to comply with court orders.") (emphasis in original).

Here, the staff of the Special Officer are monitors in name only. They do not simply oversee the Department's compliance with the Order; rather, they perform the functions of local authorities, such as the investigation of complaints of misconduct. Contrary to appellees' assertion that "[D]efendants retain the ultimate authority to determine the proper disciplinary actions," Brief for Appellees at 49, the Order provides that, based on a monitor's report, "[t]he Warden *shall* take appropriate action as detailed in the schedule of penalties," ¶ 13 (emphasis added); penalties, we might add, that the Special Officer has been given a hand in setting. *See* ¶ 8. The Order therefore cabins appellants' discretion to a far greater degree than appellees represent: rather than merely providing for the monitoring of compliance with the court's decree, the Order effectively usurps the executive functions of the District. Accordingly, we vacate the paragraphs of the Order that relate to the Special Officer and her monitors.

■ *Inmate Grievance Procedure.* The district court noted that the DCDC had established a number of policies, procedures, and regulations regarding sexual misconduct, including an Inmate Grievance Procedure ("IGP"), which allows inmates to file complaints with the authorities. *See Women Prisoners I,* 877 F.Supp. at 640. The court found, however, that "[t]hese various policies and procedures are of little value because [appellants] address the problem of sexual harassment of women prisoners with no specific staff training, inconsistent reporting practices, cursory investigations and timid sanctions." *Id.* (citation omitted). To correct this deficiency, paragraph 9 of the Order commands the District to comply with the IGP.

Appellants contend that the IGP is "a provision of local law and the Court has no business directing compliance with it." Brief for Appellants at 43. A federal court, however, is clearly in the "business" of ensuring that violations of rights protected under the U.S. Constitution do not go without a remedy. Appellants have conceded that they have failed to protect female inmates from

sexual abuse, in violation of the Eighth Amendment. We fail to grasp, therefore, how paragraph 9 is broader than required to remedy these violations, or how it unduly intrudes on appellants' local government functions. Indeed, this paragraph does not impose any new burdens on appellants; it simply requires appellants to observe their own policies and procedures in the running of their prisons. In light of the foregoing, we reject appellants' challenge to paragraph 9.

■ *Retaliation.* Evidence introduced at trial indicated that women who had filed complaints under the IGP were occasionally the victims of retaliation by DCDC employees. The district court found that the Department did not preserve the confidentiality of those inmates who had filed complaints, and "[b]y leaking private information prison officials coerce women prisoners and staff into silence and insulate themselves from scrutiny." *Women Prisoners I,* 877 F.Supp. at 666. To prevent such abuses, paragraph 7(c) of the Order prohibits

> [r]etaliation for reporting complaints of, assisting any individual in making a report of, or cooperating in an investigation of sexual harassment, regardless of the merits or the disposition of the underlying complaint. Retaliatory conduct includes the following actions taken against a prisoner in response to that prisoner's complaint of sexual harassment ...: disciplining, changing work or program assignments of, transferring to another facility of, or placing under involuntary protective custody any prisoner.

Appellants contend that this paragraph "sweeps far too broadly" and deprives them of taking any remedial action in response to fabricated claims of sexual misconduct. Brief for Appellants at 42–43.

In *Women Prisoners II,* the court addressed this specific concern. The court explained that paragraph 7(c) "does not prevent the Defendants from legitimately taking punitive action.... It simply prevents them from using disciplinary measures to cover up sexual harassment." 899 F.Supp. at 676. In light of this explanation, the Department is free to discipline, without fear of being held in contempt of court, an inmate who has fabricated a charge of sexual harassment or otherwise acted in bad faith in connection with such a charge. Accordingly, we reject appellees' challenge to paragraph 7(c).

### 3. *Overbroad Relief*

The district court found that general living conditions at the Annex and CTF and fire safety at the Annex violated the Eighth Amendment, conclusions that appellants have chosen not to contest. Parts IV and V of the Order require appellants to improve living conditions and fire safety at the facilities in a variety of ways. While appellants have specifically challenged paragraph 102 (imposing a population cap at the Annex), they further contend that the remedies ordered by the district court to address the Eighth Amendment violations are broader than necessary to correct the violations that the court had found. Indeed, they take issue, if in passing, with paragraphs 103 (replacing roof), 104 (eradication of vermin), 108 (twenty footcandles of prisoner-controlled light per bunk) and 112 (improving ventilation), which, they say, "hardly implicate the Eighth Amendment." Brief for Appellants at 40. We are unable to address questions of overbroad relief that appellants have aired in so casual a manner. Nevertheless, because of the intervening passage of the PLRA and the questions raised by both parties, in their supplemental briefs, as to the applicability of its provisions to this case, especially its provision that a court

> shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right,

18 U.S.C. § 3626(a)(1)(A), we remand this question so that the district court may have the opportunity to address this and other unresolved issues in light of the new statute as applied to the relevant facts.

### III. CONCLUSION

Because courts have little experience in the "inordinately difficult" task of running a prison, they should give deference to prison

officials where possible, *Turner*, 482 U.S. at 85, 107 S.Ct. at 2259; and because only a state court can provide an authoritative decision in an unsettled area of state law, a federal court should be reluctant to exercise supplemental jurisdiction over novel questions of local law. With these principles in mind, we have reviewed appellants' challenges to the Order and have disposed of them as follows:

*Sexual Harassment.* ¶¶ 3–19. Appellants contest the paragraphs relating to the office of the Special Officer, the Inmate Grievance Procedure, and retaliation against inmates for filing IGP complaints. While we reject appellants' objections to the paragraphs concerning the IGP and retaliation against inmates, we accept those relating to the Special Officer and her monitors. We therefore vacate paragraphs 5, 6, and 13 in their entirety and paragraphs 8, 12, 14, and 15 in relevant part as unwarranted intrusions on the functions of local government.

*Obstetrical and Gynecological Care.* ¶¶ 20–62. With the exception of paragraph 35, which appellants do not challenge, this section of the Order is based on D.C.Code section 24–442. We conclude that the district court abused its discretion in exercising supplemental jurisdiction over these local claims. We therefore vacate this entire section of the Order, with the exception of paragraph 35.

*Program Evaluation.* ¶¶ 63–101. These paragraphs were intended to remedy inequalities in access to programs that the district court held to violate both Title IX and the Constitution's guarantee of equal protection. Appellants do not challenge those paragraphs that are intended to deal with unequal access to educational and vocational programs, but challenge all the others. Because we disagree with the court's conclusion that the male and female inmates it was comparing were similarly situated, and because that conclusion was an essential element in both its Title IX and equal protection analyses, we vacate paragraphs 83–92 and 94–101 in their entirety and paragraphs 63–67 and 93 to the extent that they do not involve educational or vocational programs.

*Environmental Health.* ¶¶ 102–124. The only provision in this part of the Order specifically challenged by appellants is the provision imposing a population cap on the Annex. Because the district court failed to justify the necessity for this "last resort" remedy, we vacate paragraph 102.

*Fire Safety.* ¶¶ 125–136. Paragraphs 125–130 are intended to deal with fire hazards at the Annex, which the district court found to have violated the Eighth Amendment; paragraphs 133–136 are intended to address conditions at CTF that the court found had violated D.C.Code § 24–442; and paragraphs 131–132 relate to fire safety at both the Annex and CTF. We again conclude that the court abused its discretion by exercising supplemental jurisdiction over these local claims, and we therefore vacate paragraphs 131–132 (insofar as they relate to CTF) and 133–136 (in their entirety). Appellants have not objected to any of the paragraphs intended to address the fire hazards at the Annex; accordingly, we express no opinion as to their propriety.

Finally, we take note of the fact that appellants have charged in very general terms that the district court has ordered them to adopt measures relating to educational programs and other matters that the District can ill afford and which, they say, the court is without authority to impose. Because of the generality of appellants' charges, we are not able to address these particular complaints in this proceeding. We therefore remand these questions so that they may be resolved by the district court in the context of the PLRA. At that time, appellees will be free to argue the unconstitutionality of the Act. Also, in the interests of judicial economy, appellees may renew their arguments to the court that the substandard medical care and the fire hazards at CTF violated the Eighth Amendment.

*It is so ordered.*

## APPENDIX A

### ORDER FOR DECLARATORY AND INJUNCTIVE RELIEF

Based upon the Court's findings of fact and conclusions of law, it is by the Court this

13th day of December 1994, **ORDERED** that:

1. The Defendants' actions and inactions violated and continue to violate the Plaintiff class members' rights under the Fifth and Eighth Amendments to the United States Constitution, 42 U.S.C. § 1983, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (1988), and the District of Columbia Code §§ 24–442; and

2. The Defendants are ordered to take all action necessary to remedy and prevent the violations of the Plaintiffs' above-mentioned rights. The Defendants are ordered to take the following specific measures in the areas of sexual harassment, obstetrical and gynecological care, programs and opportunities, and environmental and fire safety. All measures shall be completed and in effect within six months of the date of this Order, unless otherwise specified.

## I. SEXUAL HARASSMENT

3. Within 60 days, the Defendants shall write and follow a Department Order prohibiting sexual harassment involving District of Columbia Department of Corrections (DCDC) employees and women prisoners. The Defendants shall post and circulate the Department Order in accordance with departmental policy.

4. Under this policy the DCDC has the obligation to take appropriate steps to prevent and remedy sexual harassment committed by its own employees.

5. One or more members from the office of Grace M. Lopes, Special Officer of the U.S. District Court for the District of Columbia, will monitor allegations of sexual harassment at each facility in which women prisoners are housed. The monitor(s) shall log in each allegation of sexual harassment, investigate the allegations, submit the results of the investigation to the Warden of the relevant facility and the Director of the DCDC and keep records of the Defendants' resolution of the matter, including disciplinary actions, of such claims.

6. The monitor(s) shall investigate all outstanding allegations of sexual harassment and shall submit a report on each allegation to the Warden of the relevant facility, and to the Director of the DCDC.

7. Prohibited conduct under the policy shall be defined as:

a. Sexual harassment which includes:

(1) all unwelcome sexual activity directed by any DCDC employee at a prisoner including acts of sexual intercourse, oral sex, or sexual touching and any attempt to commit these acts; and

(2) all unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal or physical conduct of a sexual nature directed by any DCDC employee at a prisoner; and

b. Invasions of women prisoners' privacy by male employees without a valid penological reason, including the failure of any male employee to announce his presence when entering a female housing unit.

c. Retaliation for reporting complaints of, assisting any individual in making a report of, or cooperating in an investigation of sexual harassment, regardless of the merits or the disposition of the underlying complaint. Retaliatory conduct includes the following actions taken against a prisoner in response to that prisoner's complaint of sexual harassment or cooperation in the reporting or investigation of sexual harassment: disciplining, changing work or program assignments of, transferring to another facility of, or placing under involuntary protective custody any prisoner.

d. Any breach of confidentiality by any employee concerning any report of sexual harassment.

e. Any interference with investigations of sexual harassment.

8. Penalties for prohibited conduct under the policy shall be worked out by the Director of the DCDC and the Court's Special Officer Ms. Grace Lopes within 30 days of this Order.

9. Women prisoners shall be able to report instances of sexual harassment through the existing Inmate Grievance Procedure (IGP) as specified in Department Order 4030.1D. The Defendants shall strictly adhere to the Inmate Grievance Procedure and

shall establish an Inmate Grievance Advisory Committee (IGAC) as required by Section VII(C) of Department Order 4030.1D.

10. Women prisoners shall also be able to submit IGP's or complaints concerning sexual harassment in any form, orally or in writing, to any DCDC employee, who must submit the information, in writing, to the monitor(s) and Warden of the facility within 24 hours of receiving the information. Women prisoners may also submit IGP's or complaints to an [sic] prisoner representative to the IGAC.

11. The Defendants shall establish a confidential hot line, under the supervision of the monitor(s), through which women prisoners can report allegations of sexual harassment.

12. Each employee shall be required to report any information, from any source, concerning sexual harassment, in writing, to the Warden of the facility and to the monitor(s) within 24 hours of receiving the information. Failure of an employee to report any suspected incident of sexual harassment shall subject the employee to discipline. If a prisoner so requests, the prisoner shall be treated as an anonymous informant.

13. The monitor(s) shall ensure that each reported violation of the policy is thoroughly investigated and documented. The monitor(s) shall submit a final written report to the Warden of the institution; the report shall include factual findings and a conclusion as to whether a preponderance of evidence shows that a violation of the sexual harassment policy occurred. Within 48 hours after the Warden receives the monitor(s)' report, the Defendants shall inform the complaining woman prisoner, in writing, of the outcome of the investigation. The Warden shall take appropriate action as detailed in the schedule of penalties.

14. Upon receipt of any allegation of an act of unwelcome sexual intercourse or any allegation of unwelcome sexual touching, the monitor(s) and the institution must notify the proper law enforcement agency. The monitor(s) shall communicate with the law enforcement agency concerning the status of any investigation. The monitor(s) must periodically document the status of police investigations. The occurrence of a police investigation does not relieve the monitor(s) of the duty to investigate.

15. The identity of the target of the alleged sexual harassment shall be revealed only to those who have an immediate need to know, including the monitor(s), the alleged harasser(s) or retaliator(s) and any witnesses. All parties contacted in the course of an investigation will be advised that any retaliation, reprisal, or breach of confidentiality is a separate actionable offense as provided in the schedule of penalties.

16. Any prisoner who is dissatisfied with any investigation or resolution of an allegation of sexual harassment may appeal to the Director of the DCDC within 15 days of receiving written notice of the outcome of the investigation. The Director must respond within 15 days.

17. Within 90 days, a trainer from the National Institute of Corrections (NIC), mutually agreed upon by the parties, shall conduct mandatory training on sexual harassment for all DCDC employees who work with women prisoners. The trainer shall be selected within 60 days. The monitor(s) if they so choose, may attend this training.

a. The training shall include education concerning the Defendants' policies regarding reporting, investigating, and preventing sexual harassment, and the consequences for violating any policy concerning sexual harassment; and

b. In addition to roll call training, formal training sessions on sexual harassment shall be conducted on a quarterly basis for all years succeeding entry of this Court Order.

18. Within 90 days, an outside consultant, mutually agreed upon by the parties, shall develop a sexual harassment training program and materials and conduct training on sexual harassment for women prisoners so that women prisoners know how to recognize and report sexual harassment. The trainer shall be selected within 60 days.

a. The training materials must be included in the orientation that each woman

receives upon intake or classification at each facility; and

b. Formal training sessions for women prisoners on sexual harassment shall be conducted on a monthly basis for the first year succeeding entry of the consent decree, and on a quarterly basis in all years thereafter that this decree shall remain in effect.

19. The Defendants shall make necessary alterations at both the Correctional Treatment Facility (CTF) and the Minimum Security Annex (Annex) within 60 days to ensure that women have privacy in their living, sleeping and shower areas.

## II. *OBSTETRICAL AND GYNECOLOGICAL CARE*

20. The Defendants shall hire within 60 days:

a. a nurse midwife in a half-time position who shall provide clinical and health educational services to the entire female prisoner population; and

b. an additional nurse practitioner or physician's assistant with special training in obstetrics and gynecology to provide clinical services to women prisoners at CTF.

21. The CTF OB/GYN Clinic shall maintain its current regularly scheduled hours.

22. The Defendants shall establish a prenatal clinic at CTF for women who receive their primary prenatal care at CTF. This clinic shall operate at least one half-day each week. Pregnant women shall not be required to make appointments for the prenatal clinic through the sick-call process, but rather, shall have scheduled appointments for the clinic.

23. The Defendants shall maintain statistics on the number of pregnant women and the birth outcomes of infants whose mothers delivered while incarcerated.

24. In addition to the general health interview and observation performed for male prisoners, the intake screening for all women prisoners shall include specific inquiry about her use of contraceptives or intrauterine devices, history of pregnancy, last known menstrual period, current likelihood and history of sexually transmitted diseases and pattern of drug use (if applicable).

25. In accordance with DCDC policy, the Defendants shall inform all women prisoners of the procedure to access health services while incarcerated.

26. In addition to the health appraisal conducted for male prisoners, the Defendants shall conduct a gynecological examination, including a pelvic examination and evaluation, a breast examination accompanied by patient education, a PAP smear, a chlamydia and gonorrhea culture, and a serology for syphilis. In accordance with the CTF Operations manual and National Commission on Correctional Healthcare (NCCHC) and American Correctional Association (ACA) standards, this health appraisal shall occur within 14 days of admission into the DCDC, unless there is documentation of a complete and comparable health appraisal within the previous 90 days.

27. The Defendants shall develop and implement within 90 days, an appropriate health appraisal form to correspond with the ordered health appraisal for women noted in paragraph 26.

28. The Defendants shall develop and implement within 90 days, detailed written protocols concerning routine and follow-up care for common gynecological problems including syphilis, gonorrhea, chlamydia, and pelvic inflammatory disease; PAP tests; pelvic examinations; breast examinations; education in contraception and mammography for high-risk women, in accordance with the standards of the American College of Obstetrics and Gynecology (ACOG).

29. The Defendants shall provide gynecological care within the time frames and in a manner consistent with gynecological protocols that satisfy ACOG standards unless a physician determines that in his or her medical judgment it is not medically appropriate for such care to be provided in accordance with the protocol, in which case the reasons for this determination shall be entered into the patient's medical record.

30. At a minimum, the protocol concerning the provision of gynecological care shall

provide that the Defendants shall offer and make available PAP tests to all high-risk women at CTF every six months.

31. The Defendants shall maintain a list of abnormal PAP results and, within seven days of receipt of an abnormal PAP result, shall notify the patient of the abnormal result and develop and initiate a course of treatment.

32. All women who receive an abnormal PAP test result shall be scheduled for a repeat PAP test at three-month intervals until the PAP test results are normal. Once the PAP test results are normal, a PAP test shall take place every six months. If a culdoscopy is required, it shall be performed in a manner and within time frames accepted as appropriate by ACOG standards.

33. The Defendants shall implement within 60 days a tracking system to insure that all women receive appropriate preventive gynecological care at regular intervals.

34. If a pregnancy test reveals that a woman is pregnant, routine prenatal care shall be initiated immediately.

35. The Defendants shall develop and implement a protocol concerning restraints used on pregnant and postpartum women which provides that a pregnant prisoner shall be transported in the least restrictive way possible consistent with legitimate security reasons. Specifically, the protocol shall provide:

a. The Defendants shall use no restraints on any woman in labor, during delivery, or in recovery immediately after delivery.

b. During the last trimester of pregnancy up until labor, the Defendants shall use only leg shackles when transporting a pregnant woman prisoner unless the woman has demonstrated a history of assaultive behavior or has escaped from a correctional facility.

36. The Defendants shall develop and implement within 90 days, a detailed written prenatal protocol for women who receive their primary prenatal care at CTF in accordance with ACOG standards. The protocol shall also provide guidelines to define "high-risk pregnancy." High-risk pregnancies shall be considered to include at a minimum those women with histories of alcohol and drug abuse, sexually transmitted diseases, diabetes or anemia, older women, women with poor obstetrical histories, and women expecting multiple births.

37. The Defendants shall arrange for each pregnant woman prisoner to see an obstetrician at monthly intervals during the first two trimesters of her pregnancy, bimonthly intervals during the seventh and eighth months, and weekly intervals during the ninth month. The Defendants shall arrange for women who are experiencing high-risk pregnancies to see an obstetrician at shorter than routine intervals until it is determined that the pregnancy is progressing normally.

38. The Defendants shall implement a tracking system to insure that all pregnant women are scheduled and seen regularly for prenatal care.

39. The Defendants shall permit a woman prisoner to feed her baby at D.C. General Hospital while the woman prisoner and baby remain at D.C. General Hospital.

40. The Defendants shall develop a routine visiting program for women whose children remain in D.C. General Hospital. These women shall be allowed to visit their children at D.C. General Hospital every day.

41. In accordance with the Defendants' Department Order, pregnant women prisoners shall receive counseling regarding child placement as soon as the pregnancy is known.

42. The Defendants shall designate a representative who shall develop and maintain contacts with licensed child-placing agencies, including the Department of Human Services. The Defendants shall provide training to its social workers on the range of options available for child placement, including third-party placement with family or friends, foster-care placement, and adoption. Each woman shall be given information about each of the options.

43. The nurse midwife shall implement within 90 days an obstetrical and gynecological health education program that satisfies a recognized national medical standard. Edu-

cation material should also be made available in the CTF library. The Defendants shall maintain adequate documentation on the program so that it can be evaluated by the Court within 60 days after implementation.

44. The Defendants shall have at least one medical staff member available at CTF 24 hours each day.

45. CTF medical personnel shall have telephone access to the OB/GYN physician at CTF during evening and weekend hours.

46. If a woman prisoner is in need of emergency obstetrical or gynecological care during evening or weekend hours, she shall be taken immediately to the emergency area in the OB/GYN clinic at D.C. General Hospital, unless employees providing obstetrical and/or gynecological care at D.C. General Hospital determine that the main emergency room at D.C. General Hospital would be more medically appropriate.

47. The Defendants shall provide each woman prisoner who is discharged from custody with the following:

a. a supply of essential medications that will last until she may be reasonably expected to obtain necessary follow-up care in her community; and

b. referrals to services in the community to insure continuity of care.

48. If a woman is released prior to the time that results of any gynecological or obstetrical tests are received by CTF medical personnel, the Defendants shall forward the test results to her last known mailing address.

49. The Defendants shall provide sufficient resources to insure that prisoners are transported to medical appointments in a timely fashion, including a sufficient number of security staff to transport prisoners, appropriate and sufficient transport vehicles, and appropriate waiting areas.

50. The Defendants shall modify their transportation procedures so that the transportation system alone does not cause women prisoners to wait for more than one hour at D.C. General Hospital before receiving medical care.

51. If a woman prisoner misses a medical appointment for any reason, the Defendants shall reschedule the appointment for the earliest available date. The Defendants shall use their best efforts to insure that the rescheduled appointment occurs within a medically appropriate period of time.

52. The Defendants shall comply fully with all provisions of the Memorandum of Understanding between the DCDC and D.C. General Hospital.

53. The Defendants shall assign a physician, or a member of the medical staff at CTF, who provides obstetrical or gynecological care, to serve as a liaison between CTF medical personnel and D.C. General Hospital.

54. The Defendants shall maintain the content of each medical record in an orderly and confidential manner.

55. For all pregnant women prisoners, the Defendants shall maintain a medical chart on the POPRAS form pregnancy chart, or an equivalent form, together with a regular medical chart: All medical visits to or by the responsible physician or primary health-care provider, orders for laboratory tests, laboratory test results and other notes and orders relating to the medical care of pregnant women prisoners shall be recorded on the POPRAS form or consultation form.

56. The Defendants shall develop and implement within 90 days, a new consultation form that provides adequate clinical information to D.C. General Hospital and insures that adequate information is provided by D.C. General Hospital to CTF medical personnel.

57. The Defendants shall institute, maintain and follow a system to coordinate the implementation and tracking of physician orders so that gynecological and obstetrical care will be provided within a timely fashion. The system shall coordinate all orders regardless of whether the physician orders are to be filled inside or outside the facility. This system shall be reflected in written procedural guidelines, a copy of which shall be provided to counsel for Plaintiffs within 60 days. Orders for medication are not to be tracked under this system.

58. Documentation shall be required whenever CTF medical staff elect not to follow the instructions of a consulting physician at D.C. General Hospital or elsewhere. This documentation should include the justification for not providing the therapy ordered. Only medically-based justifications shall be permissible.

59. For all women prisoners who are discharged from D.C. General Hospital or other medical facilities to CTF, CTF medical personnel shall promptly obtain a discharge summary and maintain the summary in the prisoner's medical record.

60. Prisoners shall receive notice of results of laboratory or diagnostic tests which are of no clinical significance within seven calendar days of the date the facility receives the results of such test.

61. In the case of non-emergency abnormal laboratory or diagnostic test results of clinical significance, the prisoner will be seen by the ordering physician, or if that physician is unavailable, by the Medical Officer, within 24 hours of the time the facility receives the results of such test. At such time the physician will explain the result to the patient and order such follow-up care as is appropriate.

62. The Defendants shall require a woman prisoner who refuses medical care to do so in the presence of a licensed medical staff member who can answer the patient's questions and counsel the patient concerning the consequences of a refusal. In accordance with DCDC policy regarding quality assurance, the reasons for refusal shall be analyzed regularly as part of a comprehensive and up-to-date quality assurance program. This quality assurance activity shall be documented.

## III. *PROGRAM EVALUATION*

63. The Defendants shall provide diagnostic evaluations for women prisoners similar to those currently provided for men in the Reception and Diagnostic Unit at CTF to determine women prisoners' needs, interests, and requirements for increased programs and opportunities in academic and higher education, vocation, work, religion and recreation. The procedure for the needs assessment shall be done by an approved scientific method. These evaluations shall be completed within 30–45 days of a female prisoner's transfer to CTF or the Annex. The evaluations shall include educational testing, vocational testing and psychological testing. The Defendants shall provide women with the appropriate programming called for by this evaluation within 60 days of their arrival at the facility.

64. The Defendants shall coordinate the scheduling of academic educational classes, higher education classes, vocational training, recreation time and activities, law library hours, and work in prison details for women in such a manner as to maximize women prisoners' participation in as many areas as possible.

65. The Defendants shall provide sufficient program space so that women prisoners can participate in equal and adequate programs and services as compared to men prisoners. The Defendants shall provide at least two additional trailers at the Annex (with functional sanitary facilities) to allow for additional programming activities. Within 30 days, the Defendants may submit for the Court's consideration an alternative to the 2 ordered trailers.

66. The Defendants shall develop and implement quality assurance programs for monitoring program delivery to ensure the continued provision of equal and adequate programs to women prisoners.

67. The Defendants shall increase the number of staff posted or detailed at the women's unit at CTF and at the Annex to ensure that women prisoners are escorted to educational programs, recreation, employment, and medical care as scheduled. Sufficient staff shall be provided in a manner that does not prevent the programming staff from performing any of their duties.

68. The Defendants shall provide women prisoners at the Annex with a range of academic education programs that is equivalent to the range of academic programs provided to male prisoners at the Minimum Security Facility (Minimum).

69. The Defendants shall provide women prisoners at CTF with a range of academic education programs that is equivalent to the range of academic programs provided to male prisoners at the Occoquan, Central and Medium facilities.

70. Women prisoners at the Annex and CTF shall be provided with the opportunity for full-time (five hours per day, five days per week) basic education to include ABE, GED, and Special Education classes. The Defendants shall immediately provide two full-time basic education teachers for ABE, GED, and Special Education classes at the Annex.

71. Women prisoners at CTF shall have access to on-site higher education programs which shall include a four-year B.A. and/or B.S. degree program, an A.A. degree program, a certification program, and a precollege program. The bachelor and associate programs shall be offered in a variety of fields, and at a minimum shall each offer three different areas of study leading to a degree. Within 90 days, the Defendants shall at least make the University of the District of Columbia B.A. and A.A. programs available to women prisoners at CTF.

72. The Defendants shall offer women prisoners financial arrangements for these education programs that are the same as those arrangements available to similarly situated male prisoners.

73. The Defendants shall immediately provide women prisoners at CTF with at least 30 hours of access per week to the Atlantic Union computers. Women shall be scheduled to access the computer during educational program time and during free time, including evenings and weekends. Women prisoners shall be provided with an amount of computers sufficient to meet their needs.

74. The Defendants shall immediately process the applications for Atlantic Union in a complete and timely manner. Women shall be provided with all books and course materials before the start of a course. The women shall receive substantive tutorial guidance in the course work from qualified educators.

75. The Defendants shall immediately provide appropriate substitute teachers or instructors during absences of regular teachers or instructors of more than three working days. The provision of a substitute teacher or instructor shall not result in consolidating two classes into one or increasing the class size.

76. The Defendants shall provide women prisoners at CTF with a range of vocational education programs that is equivalent to the range of vocational education programs provided to male prisoners at the Occoquan, Central and Medium facilities.

77. The Defendants shall provide women prisoners at CTF with two prevocational programs each to be at least six weeks in duration. Prevocational programs include those courses which teach personal development skills, living skills, and/or employment skills such as Employment Techniques, Awareness and Preparation (ETAP) and Lifeskills.

78. The Defendants shall provide women prisoners at CTF with a minimum of four vocational education programs, including the one program currently in place (DocuTech). These programs shall be available to female prisoners of all custody levels. A vocational education program is any program of 12 to 24 months of duration that teaches employable skills and contains both a classroom component and an on-the-job-training component. Two programs shall be operative within 120 days of the entry of this Order.

79. The Defendants shall provide women prisoners at CTF with at least two apprenticeship programs as defined by Department order.

80. All prevocational programs, vocational programs, and apprenticeships added for women prisoners at CTF shall have the potential for providing women with job skills marketable in the local labor market. An important consideration in the Defendants' selection of programs shall be the wage-earning capacity upon completion of the program.

81. The Defendants shall conduct affirmative outreach to women during the enrollment period for vocational training. This outreach shall entail DCDC staff meeting with women at least one month before the deadline for program enrollment to inform

the women that the new programs are available and to offer a full description of the available programs and any applicable criteria for participation.

82. The Defendants shall ensure that all contractual programs used to provide services to women prisoners are compatible with and fulfill the provisions of this Order.

83. The Defendants shall provide women prisoners at the Annex with a range of work opportunities that is equivalent to the range of work opportunities provided to male prisoners at Minimum.

84. The Defendants shall provide women prisoners at CTF with a range of work opportunities that is equivalent to the range of work opportunities provided to male prisoners at the Occoquan, Central and Medium facilities.

85. The Defendants shall employ capable women prisoners on all work details available at the facility where women prisoners are housed. These details shall include maintenance and trades, such as plumbing, carpentry, and electrical.

86. The Defendants shall offer equivalent industrial opportunities by establishing at least two industries at CTF or by transporting women prisoners from CTF to the industries at the Central Facility to perform industrial work. Within 60 days, the Defendants shall submit to the Court plans for the implementation of an industrial program for CTF women prisoners.

87. The Defendants shall revise the guidelines and practices for work training eligibility within 30 days to take into account the different sentence structure of female offenders and to permit women's maximum participation in work training.

88. The Defendants will immediately provide a work training program to all women prisoners who are eligible under the revised guidelines, including those who are housed at CTF as stated in the CTF Operations Manual.

89. Within 30 days of entry of this Order, the Defendants shall complete and submit work training packets for each woman prisoner eligible for work training and expedite the approval process.

90. The Defendants shall submit required paperwork for work training approval 45 days prior to a woman prisoner's eligibility date in order to complete the process by the date of eligibility. In the event that a woman arrives at the institution with less than 45 days until she is eligible for work training, the Defendants shall expedite the paperwork.

91. The Defendants shall not deny a woman prisoner the opportunity to participate in work training based on her arrival at the Annex or classification to minimum custody status within the previous 90 days or because of her impending eligibility for halfway house placement or parole.

92. The Defendants shall provide adequate staff, including case managers and vocational development specialists, to enable the women prisoners to be informed of their work training eligibility and to complete the necessary paperwork in the required time frame.

93. The Defendants shall staff a sufficient number of vocational development specialists at the Annex in order to conduct testing, classes and counseling; completes necessary paperwork and develop jobs, including nontraditional employment, and transport women to interviews. The Defendants shall provide the vocational development specialist(s) with an appropriate vehicle for transporting women to job interviews and for performing job development activities.

94. The Defendants shall provide women prisoners at the Annex with recreational opportunities that are equivalent to the recreational opportunities provided to male prisoners at Minimum.

95. The Defendants shall provide women prisoners at CTF with recreational opportunities that are equivalent to the recreational opportunities provided to male prisoners at the Occoquan, Central and Medium facilities.

96. The Defendants shall immediately provide all women prisoners at CTF, including pregnant prisoners subject to medical approval, with recreation seven days per week for at least five hours per day. Women shall have the option of going outside or to

indoor recreation facilities during this time period. This recreation schedule shall be effective at CTF within 30 days of this Order.

97. Women shall be given access to the same variety of recreation activities as are available to men, including large group events, intramurals, arts and crafts and drama activities.

98. The Defendants shall immediately open the recreation trailer at the Annex for at least 8 hours per day, 7 days a week. Correctional officers shall open and supervise the trailer when the recreation specialist is off duty. The recreation specialist shall not be assigned or pulled away from her duties as a recreation specialist for the women at the Annex, except in the case of an emergency.

99. The Defendants shall improve the Annex grounds by adding a basketball court, volleyball pit, and outdoor tables.

100. The Defendants shall provide women prisoners at the Annex with a range of religious programs and services that are equivalent to the range of religious programs provided to male prisoners at Minimum.

101. Within 60 days, the Defendants shall provide chaplaincy services to women prisoners at the Annex for 5 days per week through a staff chaplain, volunteer chaplain, or a combination of chaplain staff members. The chaplain's hours shall include evening hours during the week to accommodate those women working on details, industry, or in the community.

## IV. ENVIRONMENTAL HEALTH

102. Within one year, the Defendants shall reduce the population of Annex Dormitories 6 and 7 so that no more than 90 women are housed in the two dormitories combined.

103. Within one year, the Defendants shall repair or replace the roofs of Annex Dormitories 6 and 7 and retain them in a watertight condition.

104. Within 90 days, the Defendants shall repair the Annex dormitories so as to prevent the entry and refuge of vermin and shall conduct a vermin eradication program to eliminate the present infestation of vermin. The Defendants shall thereafter promulgate and follow an effective vermin eradication program.

105. Within 60 days, the Defendants shall provide each woman prisoner housed in the Annex dormitories at least one vertical locker and one footlocker.

106. Within 30 days, the Defendants shall replace all torn mattresses and pillows at the Annex with clean, untorn, fire-retardant mattresses and pillows. The Defendants shall conduct a regular inspection of all mattresses and pillows and shall, at that time, immediately replace any mattresses that are damaged to a degree that prevents adequate cleaning.

107. The Defendants shall immediately use cart liners or disposable or washable laundry bags to transport laundry at the Annex.

108. For as long as the Annex dormitories are double-bunked, the Defendants shall, within 60 days, provide a minimum of 20 foot candles of prisoner-controlled light to each bunk.

109. Effective immediately, the Defendants shall ensure that all housing units at the Annex are issued a timely, adequate and appropriate amount of cleaning supplies.

110. Within 60 days, the Defendants shall connect the toilets and handsinks in every Annex trailer.

111. The Defendants shall continue to provide sufficient and readily accessible sanitary facilities for women in the industries at the Central Facility.

112. Within 90 days, the Defendants shall improve the ventilation at the Annex dormitories, the print shop and the garment shop so that the quality of air in these areas is brought up to an acceptable level.

113. Within 90 days, the Defendants shall install a drainage system at the Annex which will prevent hazardous accumulations of water.

114. The Defendants shall promulgate and follow a written preventive maintenance plan for the Annex dormitories, the Annex trailers, and the Annex grounds.

115. Three times every year, the Defendants shall cause the District of Columbia Department of Consumer and Regulatory Affairs (DCRA) to inspect the Annex for compliance with the requirements of environmental sanitation and maintenance and food service delivery (at the main Minimum compound). The first such inspection shall be conducted within 45 days of the date of this Order. Within 30 days of each inspection, the Warden of Minimum shall obtain the DCRA findings. The Warden shall repair, clean, or otherwise remedy an unsanitary, unsound, or unsafe practice or condition identified by DCRA as soon as feasible but in no event later than 30 days following the receipt of the DCRA report.

116. Within 90 days, the Defendants shall hire a qualified air balancing contractor to service the CTF air handling system so that it provides an acceptable level of air quality to all areas of the facility inhabited by prisoners.

117. In the event that the air balancing and other recent repairs to the heating system at CTF fail to maintain a minimum cell temperature of 65°F in every cell, measured at the perimeter wall, the Defendants shall immediately

a. cease housing women in the end cells of each tier;

b. provide each woman prisoner with two extra blankets, two pairs of thermal underwear, and two pairs of wool socks;

c. explore means of insulating or heating the perimeter walls of the cells; and

d. report back to the Court.

118. The Defendants shall develop and implement an effective rodent prevention program.

119. Effective immediately, the Defendants shall ensure that all housing units at CTF are issued a timely, adequate and appropriate amount of cleaning supplies.

120. The Defendants shall use cart liners or disposable or washable laundry bags to transport laundry between CTF and the Jail.

121. Effective immediately, the Defendants at CTF shall monitor the food temperature and delivery times of all foods, including special diet meals, delivered to the satellite kitchen.

122. The Defendants shall promulgate and follow a written preventive maintenance plan for the CTF that includes maintenance of structures, systems, and equipment.

123. The Defendants shall ensure that the correctional officers inspect all plumbing fixtures on each shift, and shall ensure that any plumbing fixture that requires repair will be reported immediately upon discovery, and repaired immediately. The Defendants shall maintain logs demonstrating compliance with this requirement.

124. Three times per year, the Defendants shall cause the District of Columbia DCRA to conduct inspections of the CTF for compliance with the requirements of environmental sanitation, maintenance and food service delivery. The first such inspection shall be conducted within 45 days of the date of this Order. Within 30 days of each inspection, the Warden of CTF shall obtain the DCRA findings. The Warden shall repair, clean, or otherwise remedy an unsanitary, unsound, or unsafe practice or condition identified by DCRA as soon as feasible but in no event later than 30 days following the receipt of the DCRA report.

## V. FIRE SAFETY

125. Within 120 days, the Defendants shall install and maintain a manual fire alarm system and fire detection system which covers all areas used by women prisoners at Minimum, including the Annex dormitories. The fire detection system must include smoke detectors in all sleeping and dayroom areas, and smoke or heat detectors in all other areas. There must be an automatic retransmission of the above systems to a constantly attended location outside of the dormitory buildings. There must also be a control panel to provide emergency power or to send a warning if the system is not operational.

126. The Defendants must repair or replace the fire alarm system in the Administration building, the cafeteria and gymnasium at the Minimum main compound.

127. The Defendants must install a sprinkler system in the Annex dormitories and provide a 20-minute fire-rated enclosure of storage rooms located in both dormitories.

128. The Defendants shall ensure that all bed linens, blankets, and curtains or draperies in the Annex dormitories are of fire-retardant material.

129. Effective immediately, in each Annex dormitory, the Defendants shall conduct fire drills 12 times per year, 4 times per shift, and shall keep written documentation of all such drills.

130. The Defendants shall conduct and document mandatory semi-annual training on fire safety procedures for all correctional officers.

131. Effective immediately, and in accordance with Department Order No. 2920.1A, the Defendants shall:

a. conduct weekly inspections of all building[s] and grounds for fire hazards, and document such inspections;

b. conduct quarterly inspections of all fire safety equipment, and document such inspections; and

c. ensure that the Institutional Fire Marshal conducts quarterly inspections of the Facility.

132. Effective immediately, and in accordance with Department Order No. 2920.1A, the District of Columbia Fire Department shall conduct fire safety inspections of the Annex not less frequently than every 12 months. The Warden of Minimum shall obtain the Fire Department's report within 10 days and promptly give a copy to the Plaintiffs' counsel. Thereafter, the Warden shall cause any fire safety deficiencies identified in the Fire Department's report to be remedied within 30 days, or shall provide a report to the Fire Department as to why the deficiency cannot be so remedied and provide a plan to remedy the deficiency within a further period of time not to exceed 90 days.

133. Within 30 days, the Defendants at CTF shall repair the water leakage from rain, particularly in the vicinity of the high-voltage electrical conduit in the culinary storage room located in the CTF basement.

134. At CTF, the Defendants shall maintain the storage in the culinary storage room in a manner that does not prevent the sprinkler heads from functioning adequately.

135. At CTF, the Defendants shall maintain the sprinkler system and test it quarterly and they shall test the fire pump annually.

136. At CTF, the Defendants shall conduct fire drills 12 times per year, 4 times per shift, and shall keep written documentation of all such drills.

## VI. GENERAL

137. This Order shall continue in full force and effect, absent modification by the Court, until the Defendants have complied with all provisions for 5 years.

138. Plaintiffs are awarded the costs of this suit, and reasonable attorneys' fees.

## APPENDIX B

### ORDER

Upon consideration of the Defendants' Revised Motion to Stay and/or Modify Judgment, the Plaintiffs' Opposition to Defendants' Renewed Motion to Stay and/or Modify Judgment, the Defendants' Reply, the Defendants' Supplement, the Plaintiffs' Surreply, the Joint Status Motion and Motion Proposing Modifications to the Order for Injunctive and Declaratory Relief, the Plaintiffs' Status Motion Regarding ¶¶ 79 and 96 of the Order, it is by the Court this 11th day of August, 1995

ORDERED that the portion of the Defendants' Revised Motion to Stay and/or Modify Judgment in which Defendants seek a stay is DENIED; it is further

ORDERED that ¶¶ 73 and 74 of the Court's Order of December 13, 1994 are VACATED due to the termination of the Atlantic Union College program at CTF; it is further

ORDERED that ¶¶ 39, 40, 41, 42 of the Court's Order of December 13, 1994 are VACATED; it is further

ORDERED that ¶¶ 12, 17, 18, 20, 35, 43, 46, 47, 48, 49, 50, 55, 58, 60, 67, 70, 71, 75, 87,

102, 115, 123 and 124 of the Court's Order of December 13, 1994 are amended as follows:

12. Failure of an employee to report any allegation of sexual misconduct or any facts and circumstances which would lead a reasonable employee to believe that sexual misconduct is occurring or has occurred shall subject the employee to discipline.

17. The Department shall conduct mandatory training using certified trainers on sexual misconduct for all DCDC employees. A consultant from the National Institute of Corrections (NIC), mutually agreed upon by the parties, shall develop the training plan and materials. A "certified trainer" is defined as any person who has completed the "Train-the-Trainer" course developed by the NIC consultant. The monitor(s), if they so choose may attend this training.

a. The training shall include education concerning the Defendants' policies regarding reporting, investigating, and preventing sexual harassment, and the consequences for violating any policy concerning sexual harassment; and

b. All staff who work with female prisoners shall be trained by certified trainers within six months commencing no later than August 30, 1995. After the initial training of staff, the training will be included in the pre-service training of all staff. Annual retraining shall be conducted to refresh staff on the Department Order regarding sexual misconduct.

c. Within one year, selected employees working with female prisoners shall receive a forty-hour training program on working with female offenders. A semi-annual, enhancement training on special issues related to working with female offenders will be offered to selected employees.

18. Commencing no later than August 30, 1995, the Department shall conduct mandatory training on sexual harassment using certified trainers for all women prisoners currently in the DCDC. A consultant from the National Institute of Corrections (NIC), mutually agreed upon by the parties, shall develop the training plan and materials which will instruct women prisoners on the Department Order on sexual misconduct and how to recognize and report sexual harassment. Training sessions for women prisoners on sexual harassment shall be provided within a reasonable time upon a woman's entry into the D.C. Department of Corrections.

20. The Defendants shall hire within 90 days: (a) a health educator with appropriate training in obstetrics and gynecology in a half-time position who shall provide clinical and health educational services to the entire female prisoner population at CTF and (b) an additional nurse practitioner, physician's assistant with special training in obstetrics and gynecology, or nurse midwife to provide clinical services to women prisoners at CTF.

35. The Defendants shall develop and implement a protocol concerning restraints used on pregnant and postpartum women which provides that a pregnant prisoner shall be transported in the least restrictive way possible consistent with legitimate security reasons. Specifically, the protocol shall provide:

a. The Defendants shall use no restraints on any woman in labor, during delivery, or in recovery immediately after delivery; and

b. During the last trimester of pregnancy up until labor, the Defendants shall use no restraints when transporting a pregnant woman prisoner unless the woman has demonstrated a history of assaultive behavior or has escaped from a correctional facility, in which case, only handcuffs shall be used.

43. The health educator shall implement, within 60 days from the day that the health educator is hired, an obstetrical and gynecological health education program that satisfies a recognized national medical standard. Educational material should also be made available in the CTF library. The Defendants shall maintain adequate documentation on the program so that it can be evaluated by the Court within 60 days after implementation.

46. If a woman prisoner is in need of emergency obstetrical or gynecological care during evening or weekend hours, she shall be taken immediately to the emergency room at D.C. General Hospital if she is less than 20 weeks pregnant, and to the OB/GYN admit-

ting office if she is 20 or more weeks pregnant, unless employees providing obstetrical and/or gynecological care at D.C. General Hospital determine that the main emergency room at D.C. General Hospital would be more medically appropriate.

47. The Defendants shall provide each woman prisoner for whom the DCDC has advance notice of her discharge from custody with the following:

 a. a supply of essential medications that will last until she may be reasonably expected to obtain necessary follow-up care in her community; and

 b. referrals to services in the community to insure continuity of care.

48. If a woman is released prior to the time that abnormal results of any gynecological or obstetrical tests are received by CTF medical personnel, the Defendants shall forward the test result[s] to her last known mailing address. Defendants shall advise women prisoners of this policy.

49. The Defendants shall ensure that prisoners are transported to medical appointments on time.

50. The Defendants shall modify their transportation procedures so that women prisoners arrive at D.C. General Hospital no more than 2 hours before the scheduled time of their appointment.

55. For all pregnant women prisoners, the Defendants shall maintain a medical chart on an ACOG form together with a regular medical chart. All medical visits to or by the responsible physician or primary healthcare provider, orders for laboratory tests, laboratory test results and other notes and orders relating to the medical care of pregnant women prisoners shall be recorded on the ACOG form or consultation form.

58. Documentation shall be required whenever CTF medical staff elect not to follow the instructions of a consulting physician at D.C. General Hospital or elsewhere. This documentation should include the justification for not providing the therapy ordered.

60. Prisoners shall receive notice of normal results of laboratory or diagnostic tests at the discretion of the physician or upon request by the woman prisoner.

67. The Defendants shall ensure that women prisoners are escorted to and arrive at educational programs, recreation, employment, and medical care in a timely manner as scheduled in a manner that does not prevent the programming staff from performing any of their duties.

70. Women prisoners at the Annex and CTF shall be provided with the opportunity for full-time (three hours per day, five days per week at CTF and five hours per day, five days per week at the Annex) basic education to include ABE, GED, and Special Education classes.

71. Women prisoners at CTF shall have access to on-site higher education programs which shall include a four-year B.A. and/or B.S. degree program, an A.A. degree program, and a precollege program. At a minimum, bachelor programs shall be offered in one area of study, and associate programs in two different areas of study leading to a degree. Defendants shall comply with the precollege requirement of this provision within 90 days.

75. Within 90 days, the Defendants shall provide appropriate substitute teachers or instructors during absences of regular teachers or instructors of more than three working days. The provision of a substitute teacher or instructor shall not result in increasing the class size beyond acceptable community standards for a period of time exceeding 15 consecutive school days.

79. The Defendants shall provide women prisoners at CTF with at least one apprenticeship program as defined by Department order.

87. The Defendants shall revise the Department of Corrections guidelines and practices for work training placement within 30 days to take into account the different sentence structure of female offenders and to permit women's maximum participation in work training.

96. The Defendants shall immediately provide all women prisoners at CTF, including pregnant prisoners subject to medical approval, with recreation for twenty-five

hours per week. Women shall have the option of going outside or to indoor recreation facilities during the time period. This recreation schedule shall be effective at CTF within 15 days of this Order.

102. Within one year, the Defendants shall reduce the population of the Annex Dormitories 6 and 7 so that no more than 135 women are housed in the two dormitories combined.

115. Three times every year, the Defendants shall cause the District of Columbia Department of Consumer and Regulatory Affairs (DCRA) to inspect the Annex for compliance with the requirements of environmental sanitation and maintenance and food service delivery (at the main Minimum compound). If any area is shown to be in compliance after completion of an inspection, the mid-year inspection may be an abatement inspection rather than a full inspection. At a minimum, DCRA shall conduct full compliance inspections at the Annex two times every year. Within 30 days of each inspection, the Warden of Minimum shall obtain the DCRA findings. The Warden shall repair, clean, or otherwise remedy an unsanitary, unsound, or unsafe practice or condition identified by DCRA as soon as feasible but in no event later than 30 days following the receipt of the DCRA report.

123. The Defendants shall ensure that the correctional officers inspect all plumbing fixtures daily, and shall ensure that any plumbing fixture that requires repair will be reported immediately upon discovery, and repaired in a timely manner. The Defendants shall maintain logs demonstrating compliance with this requirement.

124. Two times per year, the Defendants shall cause the District of Columbia DCRA to conduct inspections of the CTF for compliance with the requirements of environmental sanitation, maintenance and food service delivery. Within 30 days of each inspection, the Warden of CTF shall obtain the DCRA findings. The Warden shall repair, clean, or otherwise remedy any unsanitary, unsound, or unsafe practice or condition identified by DCRA as soon as feasible but in no event

later than 30 days following the receipt of the DCRA report.

It is further

ORDERED that all deadlines shall run from the date of entry of this Supplemental Order.

ROGERS, Circuit Judge, concurring in part and dissenting in part:

Because I find no novel question of law as would pose an obstacle to the district court's exercise of supplemental jurisdiction over the prisoners' request for injunctive relief from violations of D.C.Code § 24–442, I dissent from Part II A of the court's opinion. Further, because I conclude that the court's equal protection analysis is flawed, I would affirm the district court's ruling that the prisoners were denied their Fifth Amendment right to due process by the District of Columbia's giving them unequal access to a variety of programs on the basis of their sex, and therefore dissent from Part II B of the court's opinion.[1] In other respects I concur in the court's opinion.

## I.

On the basis of its identification of a novel question of District of Columbia law, the court concludes that the district court abused its discretion in rejecting the District's invitation to decline jurisdiction pursuant to 28 U.S.C. § 1367(c) over the prisoners' claims arising under D.C.Code § 24–224. While I join the court's account of the general structure of the law of supplemental jurisdiction, Op. at 920–21, and I agree that the district court "clearly had the power" to hear the prisoners' claims arising under D.C.Code § 24–442, Op. at 921, I do not agree that an intolerable novel issue posed an obstacle to the court's exercise of jurisdiction. In the terms of the supplemental jurisdiction statute, the prisoners' local-law claims did not raise novel or complex issues of local law; nor did this case present exceptional circumstances in which there were compelling rea-

---

1. Like the court, I do not reach the question, which is one of first impression in this circuit, whether the challenged programs are subject to Title IX. Op. at 927–28.

sons to decline jurisdiction. 28 U.S.C. § 1367(c) (1, 4) (1994).

Of course, there is some degree of novelty in applying even the hoariest of legal rules to the facts presented in each new case; there is obviously a greater degree of novelty in construing an ambiguous phrase in a newly enacted statute. The question a district court must ask about a local-law claim under § 1367(c)(1), therefore, is not, "Is it novel?" but, "How novel is it?" The reason for asking this question is obvious: the more novel a local-law issue is, the more likely the federal court is to get it wrong, in the sense of deciding the issue differently from how a local court would have decided it. *See United ed Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (endorsing discretionary dismissal of pendent state-law claims in order to "procur[e] for [the parties] a surer-footed reading of applicable law"). The question of "novelty" is really a question of uncertainty; the issue is how predictable the decision of the local courts would be in light of existing local-law authorities.[2] Thus, the appropriate framework for deciding the instant appeal is the standard described in *Financial Gen. Bankshares, Inc. v. Metzger*, 680 F.2d 768, 776 (D.C.Cir.1982): "the degree of uncertainty in state law is one of several factors that should guide the District Court's discretion," albeit a factor that "should be given considerable weight."

In light of the appropriate standard, this case differs from those relied on by the court. The local-law issues raised by the prisoners' claims are simply not novel. The sole local-law issue cited by the court as "novel"—whether local trial court has the power to impose injunctions when ongoing and systemic violations of a statutorily imposed duty of care have been proved and all of the usual conditions for granting injunctive relief have been met, Op. at 923—is considerably further toward the "certain" end of the continuum than are issues presented by cases such as *Financial General* and *Doe v. Board on Prof. Resp. of the D.C. Ct. of Appeals*, 717 F.2d 1424 (D.C.Cir.1983) (per curiam). The issue in the instant case is whether the familiar general power of the Superior Court of the District of Columbia to award equitable relief, D.C.CODE § 11–921(a), can be applied to a statute whose substantive content has been explicated by several authoritative decisions of the District of Columbia Court of Appeals. *See* Op. at 921 (collecting local cases). By contrast to this question of institutional power, the courts in *Financial General* and *Doe* were faced with questions concerning regulations and causes of action that had never been addressed by the local courts at all.[3] In *Financial General*, the district court was faulted for deciding a number of difficult questions involving an attorney's duties in complex corporate transactions when "[n]o court of the District of Columbia has provided any guidance regarding the standards defining an attorney's fiduciary duties, the construction of the conflict of interest provisions of the Code of Professional Responsibility, or the remedies for breach." 680 F.2d at 769. Moreover, the district court abused its discretion by reaching out to decide these questions when all of the federal claims on which original jurisdiction was founded had been dismissed, a factor that is not present in the instant case. *Id.* at 769, 776. As for *Doe*, this court characterized the local-law issues as "[w]hether the Board on Professional Responsibility may subpoena records necessary to performance of its regulatory mandate and what construction to give to Court of Appeals

---

**2.** Thus, even when there is no shortage of authority on a question, the district court may dismiss a local-law claim where a conflict among the authorities leaves the issue uncertain. *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266 (D.C.Cir.1995).

**3.** The same is true of *Grano v. Barry*, 733 F.2d 164, 169 (D.C.Cir.1984), also cited by the court, in which the local ballot initiative at issue was "new [and] its meaning ambiguous and sharply disputed." In that case, moreover, plaintiff had not even pled a claim based on local law. The district court had entered an injunction based solely on federal law, which this court vacated. This court held that it would be inappropriate to permit the plaintiff to attempt to reinstate the injunction by adding a local-law claim on remand, now that the federal claims had been dismissed: "[E]ntertaining such a claim now would be somewhat like initially taking jurisdiction over a local law issue when there is no federal claim to which it could be pendent." *Id.*

regulations governing the Board's exercise of its asserted subpoena power...." 717 F.2d at 1428. *Doe* thus involved the construction of the grant of authority to a particular local entity, a question that could not be answered with any certainty without a local decision on the subject. Both *Financial General* and *Doe* stand in contrast to the purportedly "novel" issue raised by the prisoners, which is whether well-settled remedies rules of general applicability should be applied to their case.

Nor can there be any doubt that the law of remedies is well-settled in the District of Columbia. The District of Columbia Court of Appeals has repeatedly held that the local trial court enjoys broad equitable jurisdiction pursuant to D.C.CODE § 11–921(a). *Hessey v. Burden,* 615 A.2d 562, 571 (D.C.1992) (collecting cases); *McIntosh v. Washington,* 395 A.2d 744, 748–49 (D.C.1978). The standards governing the exercise of equitable powers are also well-defined. *Ifill v. District of Columbia,* 665 A.2d 185, 187–88 (D.C.1995). Finally, the use of those powers to effect institutional change in a variety of local governmental departments and agencies is almost a commonplace in this jurisdiction,[4] as it is in state courts[5] throughout the Nation.

*See* DAN B. DOBBS, LAW OF REMEDIES § 7.4(4) (2d ed.1993) (describing prevalence of structural injunctions in civil rights cases, including prison reform litigation). Whatever other objections might be raised to the district court's enforcement of local law in this case, therefore, it cannot be said that the court's action was novel. *See Campbell v. McGruder,* 416 F.Supp. 100, 105 (D.D.C.1975) (for constitutional violation, imposing mandatory injunction that in part required local agencies to remedy violations of local fire, building, housing, health, and food regulations at D.C. Jail); *Campbell v. McGruder,* 580 F.2d 521, 544 n. 47 (D.C.Cir.1978) (noting that no appeal had been taken from that portion of the injunction).[6]

The court raises three arguments in support of its conclusion that the district court abused its discretion by entertaining local-law claims that were within its jurisdiction. First, the court notes that injunctions were "never regarded as relief of first resort," cites the ancient rule that equitable relief will not lie if plaintiff has an adequate remedy at law, and points out that "a variety of factors, including the public interest, may weigh against the award of an injunction." Op. at 922. With respect, none of this has anything

4. *E.g., Kelly v. Parents United for the D.C. Pub. Schools,* 641 A.2d 159, 163, 165 (D.C.1994) (affirming permanent injunction and noting that trial court considered "ordering school closures and incarceration with work release for responsible District officials as possible sanctions" when District failed to comply); *In re Savoy,* Nos. 70–4808 & 70–4714, 98 Daily Wash. L. Rptr. 1937 (D.C.Super. Ct. Oct. 13, 1970) (imposing structural injunction on juvenile detention facility); *In re Savoy,* Nos. J–4808–70, etc., 101 Daily Wash. L. Rptr. 317 (D.C.Super. Ct. Feb. 20, 1973) (same); *Pearson v. Kelly,* No. 92–CA–14030, 122 Daily Wash. L. Rptr. 1837 & 1849 (D.C.Super. Ct. Aug. 18, 1994) (appointing receiver over Department of District government for repeated violations of federal law). *See also* DeNeen L. Brown & Lonnae O'Neal Parker, *Schools Again Running Afoul of D.C. Fire Code, Judge Finds,* WASH. POST, July 3, 1996, at B1. *Cf. In the Matter of an Inquiry into Allegations of Misconduct Against Juveniles Detained at and Committed at Cedar Knoll Institution,* 430 A.2d 1087, 1093, 1101 (1981) (Ferren, J., dissenting) (noting power of branch of Superior Court to award sweeping structural injunction in properly pled class action).

5. Although the District of Columbia is not a state, its local court system has enjoyed powers commensurate with those of the states for a quarter of a century. *Palmore v. United States,* 411 U.S. 389, 392 n. 2, 93 S.Ct. 1670, 1674 n. 2, 36 L.Ed.2d 342 (1973) ("Congress ... invested the local courts with jurisdiction equivalent to that exercised by state courts"); *id.* at 409, 93 S.Ct. at 1682 (noting that the functions of the District of Columbia courts are "essentially similar to those of the local courts found in the 50 States of the Union"). *Cf. McIntosh,* 395 A.2d at 749 n. 10 ("Congress ... intended to transfer to the new local courts all those local judicial powers previously exercised by the United States District Court for the District of Columbia."). The judges of the Superior Court of the District of Columbia would therefore be as surprised as the judges of any state court of general equitable jurisdiction to hear it suggested that they lacked the authority to impose appropriate injunctive relief in the face of ongoing institutional failure to meet a legal duty of care.

6. The District did not appeal the district court's finding in the instant cases that general living conditions at the Annex and CTF and fire safety at the Annex violated the Eighth Amendment. Op. at 928.

to do with novelty. Quite the opposite, in fact: the rules cited by the court were formulated by the Chancellor long before the District of Columbia even existed. *See* DOBBS, *supra,* at § 2.5 (reviewing history of equitable requirement of no adequate remedy at law). If the district court was too hasty in awarding equitable relief, that would be an error *on the merits* of the prisoners' claims having nothing to do with the question whether the claims should have been entertained in the first place. The mistake would be a misapplication of well-settled law, rather than a failure to predict the future development of an unsettled issue in the local courts.

The court's second point is that "we can find no case in which a D.C. court has awarded injunctive relief under section 24–442."[7] Op. at 922. The theory is that the local courts might classify § 24–442 among causes of action that apply "ordinary tort principles," rather than among those that permit equitable relief. *Id.* at 921. There is no reason, however, to suppose that the local courts would embrace the dichotomy invent-ed by this court, because the availability of equitable relief *is* an ordinary principle of tort law, assuming that the conditions for such relief have been met. RESTATEMENT (SECOND) OF TORTS § 936 (1979). This is no less true simply because the prisoners' cause of action arises from a statute.[8]

> [A]lthough we examine the text and history of a statute to determine whether Congress intended to create a right of action . . . we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise. This principle has deep roots in our jurisprudence.

*Franklin v. Gwinnett County Pub. Schools,* 503 U.S. 60, 66, 112 S.Ct. 1028, 1032, 117 L.Ed.2d 208 (1992). Ordinarily, of course, the remedy for an isolated violation of a duty of care is money damages. Here, however, the plaintiffs alleged persistent violations that threatened ongoing harm to them and prayed for injunctive relief pursuant to local law, *cf. Grano,* 733 F.2d at 169. An injunction is the "appropriate" remedy when such claims are proven.[9]

---

7. History suggests an explanation for the absence of local cases in which the District of Columbia courts have imposed injunctive relief upon finding a violation of D.C.Code § 24–442. Until Congress enacted the D.C. Court Reform and Criminal Procedure Act of 1970, Pub.L. 91–358 (July 29, 1970), 84 Stat. 473, the local courts were courts of limited jurisdiction. The transfer of jurisdiction from the federal to the local courts was not completed until 30 months after July 29, 1970. *See id.,* 84 Stat. 479, citing D.C.Code § 16–2901. Litigation seeking injunctive relief in connection with District of Columbia correctional facilities predated the completed transfer and has a long history in the federal courts, premised on violations of the constitution and thus necessitating no recourse to D.C.Code § 24–442. Although the court asserts that D.C. prisoners seeking injunctive relief are no strangers to the local courts, Op. at 922, it cites no cases, and hence there is no reason to assume that D.C. prisoners have sought injunctive relief for violations of D.C.Code § 24–442 and the local courts have ruled that the statute will not support injunctive relief. To suggest, moreover, that a local court would be engaged in "usurp[ation]" were it to find violations of D.C.Code § 24–442 and to invoke its injunctive powers under D.C.Code § 11–921, Op. at 923, goes to the merits and simply ignores the local court's own view of the breadth of its remedial authority and its invocation of them. *See Hessey v. Burden,* 615 A.2d at 571, and *supra* n. 4.

8. In an argument not relied on by the court, the District contends that because the local courts have construed the *substantive* requirements of § 24–442 in light of the analogous federal statute, 18 U.S.C. § 4042 (1994), it would also limit the *remedies* available under the local law to those available under federal law. *See Matthews v. District of Columbia,* 387 A.2d 731 (D.C.1978) (citing *Jones v. United States,* 534 F.2d 53, 54 (5th Cir.1976), *cert. denied,* 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 586 (1976)). Whereas the federal government has waived sovereign immunity in these circumstances to permit money damages only, however, the municipal immunity of the District is of much smaller scope, and local sovereign immunity law has developed independently from federal sovereign immunity law. *Wade v. District of Colum.,* 310 A.2d 857, 860–61 (D.C.1973) (in banc). The frequency with which local courts have ordered structural injunctions against District departments and agencies bears witness to this independence.

9. *See, e.g., Bear v. Iowa Dist. Ct.,* 540 N.W.2d 439, 441 (Iowa 1995); *Riha v. FirsTier Bank,* 248 Neb. 785, 539 N.W.2d 632, 637 (1995); *Stern v. Delphi Internet Svcs. Corp.,* 165 Misc.2d 21, 626 N.Y.S.2d 694, 696 (N.Y.Sup.Ct.1995); *Ducham v. Tuma,* 265 Mont. 436, 877 P.2d 1002, 1006 (1994); *May Dep't Stores Co. v. State ex rel. Woodard,* 863 P.2d 967, 978 (Colo.1993); *Jensen v. General Elec. Co.,* 82 N.Y.2d 77, 603 N.Y.S.2d 420, 426, 623 N.E.2d 547, 553 (1993); *Kaplan v.*

The court's holding thus resolves to this: it is intolerably novel for a district court to assume that remedies generally applicable to persistent institutional violations of duties of care will apply to such violations of a particular duty of care until the local courts so apply it—even when there is no local authority remotely suggesting that the general rule would not apply. That cannot be the law. As noted, the application of a well-settled general rule to a current case always presents some degree of novelty. It is the exception, however, for the district court to decline to exercise supplemental jurisdiction, *see* 13B Charles Alan Wright et al., Federal Practice and Procedure § 3567.3 & n.17 (Supp. 1996), and therefore the application of a general rule in the context of a particular case must be fairly uncertain before a local-law claim may be dismissed. To say that the local-law claims in this case not only may but *must* be dismissed is to suggest that it is the *exercise* of supplemental jurisdiction that is the exception.

The court turns finally to another paragraph of § 1367, asserting that the "intrusiveness" of the remedy is "[an]other compelling reason[ ] for declining jurisdiction." Op. at 923 (citing 28 U.S.C. § 1367(c)(4)). Again, the court confuses the question whether the district court was correct on the merits with the question whether the claims should have been heard at all. If the remedy is too intrusive, contains overly "detailed marching orders," Op. at 923, or is not sufficiently connected to proven violations of the District's duties, then this court should vacate erroneous portions of the order, rather than permitting the District to continue illegally inflicting injuries on the prisoners by dismissing the claims altogether.[10]

The court expands the scope of § 1367(c)(4) to cover ground that is already treated by other doctrines. Section 1367(c)(4) is a catch-all provision; it permits the district court to recognize situations unforeseen by the drafters in which it is appropriate to decline jurisdiction. By using such words as "exceptional" and "compelling," however, Congress indicated that invocations of § 1367(c)(4) should be rare. *Executive Software N. Amer., Inc. v. United States Dist. Ct.*, 24 F.3d 1545, 1558 (9th Cir.1994). In particular, there is no "compelling" reason to decline jurisdiction where other doctrines exist to protect the interests purportedly supporting dismissal. The Supreme Court cases cited by the court that require caution in deciding when to impose a structural injunction and further caution in fashioning such an injunction, for example, create a doctrine of remedies that protects states and localities from overly intrusive and far-reaching federal oversight of local institutions. Op. at 919–20 (citing, *inter alia, Lewis v. Casey*, —— U.S. ——, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)). Abstention doctrines also recognize the important interests of states in retaining control of complex matters of local administration. *E.g., Burford v. Sun Oil Co.*, 319 U.S. 315, 317–18, 63 S.Ct. 1098, 1098–1100, 87 L.Ed. 1424 (1943); *Louisiana Power & Light Co. v. Thibodaux*, 360 U.S. 25, 29, 79 S.Ct. 1070, 1073, 3 L.Ed.2d 1058 (1959). There is no occasion to depart from the carefully delineated boundaries of these doctrines by invoking the very general language of § 1367(c)(4).

The federal courts have an obligation to resolve claims falling within their jurisdiction.[11] *Quackenbush v. Allstate Ins. Co.*, —— U.S. ——, ——, 116 S.Ct. 1712, 1720, 135 L.Ed.2d 1 (1996). In a few cases, there are good reasons for declining to do so. *Id.* at ——–——, 116 S.Ct. at 1720–21. This is

---

*Prolife Action League of Greensboro*, 111 N.C.App. 1, 431 S.E.2d 828, 838 (1993).

**10.** The District's challenge to the portion of the district court's remedial order addressing medical care is limited to the assertion that supplemental jurisdiction was improperly exercised. The District has not challenged the scope of the relief ordered. Because of its agreement with the District's position on supplemental jurisdiction, the court does not reach the question whether the district court's order was properly crafted. I also express no opinion as to the propriety of the relief ordered.

**11.** Local-law claims falling within the district court's supplemental jurisdiction pursuant to § 1367(a) do not lose their jurisdictional character simply because they meet one of the criteria for discretionary dismissal pursuant to § 1367(c). *LaShawn A. v. Barry*, 87 F.3d 1389, 1396–97 (D.C.Cir.1996) (in banc).

not one of them. The prisoners' claims present a garden-variety prayer for injunctive relief that raises only limited uncertainty in the application of local law. Further, the district court's power to grant broad relief for local-law violations is adequately circumscribed—as it is with respect to federal violations—by the doctrines governing equitable relief in institutional reform litigation. Accordingly, as the court has done with other portions of the order, I would remand ¶¶ 20–34, 36–62, 131–32, and 133–36 of the order so that the district court might consider the effect of any changed factual circumstances and the intervening passage of the Prison Litigation Reform Act of 1995, Pub.L. No. 104–134, §§ 801–02 (1996).

## II.

The court's equal protection analysis is also flawed. Two people commit the same crime. Each is similarly convicted by a District of Columbia court. In all respects—criminal history, family circumstances, education, drug use, favorite baseball team—they are identical. All save one, that is: they are of different sexes. Solely because of that difference, they are sent to different facilities at which the man enjoys superior programming options. Rather than examine whether the District can justify its separate and unequal treatment of the sexes, however, the court concludes that concludes that equal protection principles do not even apply: these two identical prisoners are not "similarly situated." Op. at 923–25.

Not surprisingly, there are flaws in an analysis that concludes that identical people are not similar. The court errs because it starts in the middle, rather than at the beginning. The District consigns similarly situated men and women to separate facilities having different characteristics, acting expressly on the basis of their sex. The court relies on the different characteristics of *the facilities* to conclude that the otherwise identical men and women incarcerated therein are not similarly situated, and on that basis holds that there can be no judicial compari-

son of the differences in the treatment accorded to them. The anomalous result is that the more unequal the men's and women's prisons are, the less likely it is that this court will consider differences in the prison experiences of men and women unconstitutional. Indeed, by maintaining drastically unequal prisons for the two sexes, the government could foreclose any comparison of the rehabilitative programs it provides for the benefit of men and women. This analysis stands the concept of equal protection on its head. The District may not treat men and women dissimilarly and then rely on the very dissimilarity it has created to justify discrimination in the provision of benefits. I therefore dissent from Part II B of the court's opinion.

## A.

Proper analysis starts from a feature of the District's prisons that has not been challenged: the physical separation of male and female prisoners. Because the prisoners have not challenged sex segregation, the court must assume that such segregation is lawful: in other words, that this facial sex-based classification "serves important governmental objectives and ... the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia,* —— U.S. ——, ——, 116 S.Ct. 2264, 2271, 135 L.Ed.2d 735 (1996) (*"VMI"*) (quoting *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982)).[12] What should not be assumed, however, is the propriety of the very practice challenged by the prisoners. Even if the District may properly segregate prisoners by sex, it does not follow that it may segregate them by sex *into unequal facilities.* Put in doctrinal terms, the "important governmental objectives" served by the physical separation of the sexes are not necessarily served by providing different benefits to the segregated populations. Thus, to justify depriving women of the programming choices available to men, the District must explain how the depri-

---

12. *But cf.* Rosemary Herbert, Note, *Women's Prisons: An Equal Protection Evaluation,* 94 YALE L.J. 1182, 1204 (1985) (considering possible jus-

tifications for sex segregated prisons and concluding that such prisons violate the Constitution).

vation substantially relates to the achievement of an important governmental objective.[13] *Pitts v. Thornburgh,* 866 F.2d 1450, 1453–55 (D.C.Cir.1989); *West v. Virginia Dep't of Corrections,* 847 F.Supp. 402, 406 (W.D.Va.1994).

The court relieves the District of its constitutional obligation by ignoring how the prisoners came to be segregated. Referring instead to the size, location, and other "physical limitations" of the women's prison facilities, the court concludes that women who inhabit those facilities are not similarly situated to otherwise identical men who are incarcerated elsewhere. Because the District places men and women into physically different facilities on the basis of sex, however, the court's argument that differences in the facilities justify the inferior treatment accorded to women is "notably circular." *VMI,* —— U.S. at ——, 116 S.Ct. at 2281.

> [T]he State avoids the fact that *all* State female felons are sent to Huron Valley while *all* male felons are *not* confined in a facility of comparable limitations. In this context, "institutional size" is, frankly, not a justification but an excuse for the kind of treatment afforded women prisoners.

*Glover v. Johnson,* 478 F.Supp. 1075, 1078 (E.D.Mich.1979). Under the court's rationale, it would almost seem that the District could send men to a country club and women to the Black Hole of Calcutta; a difference in treatment the women received there would be ascribed to their dissimilar situation and would require no further justification. Less fancifully perhaps, the District could provide only stereotypically feminine programming at the women's prisons, such as cooking and sewing classes, while providing men with training in stereotypically masculine pursuits such as construction and carpentry.[14] Or the District could simply cease providing any programming at all at the women's prisons. *See West,* 847 F.Supp. at 407. In any of these cases, the court apparently would not examine the differences in treatment accorded to men and women. The court's holding that male and female prisoners are dissimilarly situated would preclude constitutional comparison of programming no matter how vast the differences in programming were.

This is not to suggest that population size is completely irrelevant to equal protection analysis. Because women comprise a fairly small (but rising) percentage of felons, it is not reasonable to expect that the menu of programs at a women's prison will be exactly the same as that at a men's prison. This, however, is properly accounted for in determining whether the benefits afforded to women are substantially equivalent to those afforded to men. The court errs by using different population sizes to avoid making a comparison at all. Nor does a "per inmate" numerical comparison suffice. *See* Op. at 925. As the district court recognized, the programs available to men are often different in kind, not only in number, from those available to women.[15]

---

**13.** The Supreme Court has repeatedly emphasized that the sex-based classification itself must further the governmental objective. Thus, it is not enough that providing programs to men furthers a governmental purpose; depriving women of equal treatment must also be substantially related to that purpose. *J.E.B.,* 511 U.S. at ——, 114 S.Ct. at 1425 ("the only question is whether discrimination on the basis of gender in jury selection substantially furthers the State's legitimate interest in achieving a fair and impartial trial").

**14.** Constitutionally, it would be equally objectionable if the District provided the women with construction and carpentry classes and the men with sewing and cooking classes.

**15.** *See, e.g., Women Prisoners I,* 877 F.Supp. at 657 (noting that work details at the Annex are limited to such things as housekeeping and library work, while men at Minimum have access to work details in carpentry, plumbing, and other skilled tasks); *id.* at 659 (women at CTF have access to associate degree programs, while men at Central, Medium, and Occoquan can earn bachelor's degrees). "Visiting American prisons in the 1990s is like taking a time machine back to the high schools of the '50s, where the boys took Shop, and the girls learned cooking, baking, and sewing—glorified under the name of Home Economics." Stephen J. Schulhofer, *The Feminist Challenge in Criminal Law,* 43 PENN. L.REV. 2151, 2198 (1995). Another commentator has observed that differences in population do not "account for the inferior quality of the programming. Only discrimination explains why male prisoners are assigned to apprenticeships that lead to well-paying and secure jobs outside of prison while female prisoners are relegated to those which require little to no training." Stefanie Fleischer Seldin, *A Strategy for Advocacy on*

The constitutional guarantee as well as Supreme Court doctrine require that when the government confines people and segregates them by sex, it has a duty to justify not only the fact of segregation but also any differences in the facilities into which men and women are segregated.[16] Therefore, even if the District may constitutionally segregate prisoners by sex, it does not thereby gain the right to treat men and women differently in other respects. Rather, differences in post-segregation treatment—like any other sex-based provision of governmental benefits and burdens—must meet the heightened scrutiny test outlined in *VMI*. If a difference in programming were inherent in the fact of sex-segregated prisons, for example, then the same governmental interest that supports sex segregation might support the programming difference.[17] If it were reasonably feasible to have identical programming in sex-segregated facilities, however, then any differences would not be substantially related to the objectives justifying segregation, and the District would have to justify the difference on some other ground.

The Supreme Court's sex discrimination cases make it clear that the government may not rely on generalizations—even somewhat accurate ones—about women to justify different treatment of the sexes. *VMI*, — U.S. at —, 116 S.Ct. at 2280; *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, — n. 11, 114 S.Ct. 1419, 1427 n. 11, 128 L.Ed.2d 89 (1994). Yet that is what the court permits the District to do, in the guise of requiring the district court to consider "special characteristics" of the male and female prison populations as a whole. For an idea of what "special characteristics" might be, the district court should presumably have consulted the opinion in *Pargo v. Elliott*, 894 F.Supp. 1243 (S.D.Iowa 1995), cited with evident approval by this court. Op. at 924. *Pargo* noted the following programs devoted to the "special characteristics" of the female prison population in Iowa: "[p]rograms about domestic violence, prostitution, and incest survivors"; "a family preservation program" apparently devoted to the needs of prisoners who had been custodial parents; "counseling for postpartum depression"; "classes in anger management and self-esteem"; and unspecified programs for inmates with eating disorders. 894 F.Supp. at 1261. Assuming that the "special characteristics" identified by *Pargo* are more common among women than men, it is unclear why that fact should prohibit a particular woman from choosing to work on a carpentry detail over receiving counseling for post-partum depression.[18] "[E]stimates of what is appropriate for most women[ ] no longer justify denying opportunity to women whose talent and capacity place them outside the average description." *VMI*, — U.S. at —, 116 S.Ct. at 2284.

What the Constitution commands, rather, is that the District address directly the differences among *individuals* that pertain to the purposes of its prison programs, rather than using sex as a proxy for such differences. If, for example, the purposes of prison programs would be served by providing special programs for prisoners with substance abuse problems, the District could offer such programs to drug-addicted prisoners of both sexes. It would not be permissible, however, for the District to presume that women as a group were more likely to have such problems and therefore offer drug-related programming only at women's facili-

---

*Behalf of Women Offenders*, 5 COLUM. J. GENDER & L. 1, 3 (1995).

**16.** *As the VMI Court emphasized, even if one assumes that sex segregation is permissible, as segregation by race once was, the government must at least meet the separate-but-equal standard: "In line with Sweatt [v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950),] we rule here that Virginia has not shown substantial equality in the separate educational opportunities the State supports" at single-sex colleges. — U.S. at —, 116 S.Ct. at 2286.*

**17.** *But cf.* NICOLE HAHN RAFTER, PARTIAL JUSTICE: WOMEN, PRISONS, AND SOCIAL CONTROL 195–207 (1990) (discussing solutions to historical "inferior treatment" of women prisoners that do not require integration of the sexes).

**18.** Nor, for that matter, why a man lacking in confidence should be denied the opportunity to take classes in self-esteem just because men in general may hold themselves in higher esteem than do women.

ties.[19] The court's similarly-situated analysis encourages the District to take such impermissible actions. By immunizing the District from any comparison of programming at men's and women's prisons, the court's decision may result in having more "woman-appropriate" programming at the women's facilities. Subjecting programming choices to appropriate equal protection analysis ensures that the District meets its constitutional obligation to give equal opportunities to male and female individuals. The court errs by exempting from comparison the benefits the District provides to men and women prisoners, and thus exempting the District from having to justify its different treatment of the sexes.

### B.

Aside from treating the government-imposed segregation of the sexes into different facilities as if were *sui generis* and of no constitutional importance, the court also misconceives what it means for persons to be "similarly situated" for purposes of equal protection analysis. Whether two people (or classes of people) treated differently by the government are similarly situated depends on the purpose for which the government is acting. *Cf. Klinger v. Department of Corrections*, 31 F.3d 727, 734–35 (8th Cir.1994) (McMillian, J., dissenting) (noting that men and women are imprisoned for the same purpose and are similarly situated "with respect to the goal of rehabilitation"); *Glover*, 478 F.Supp. at 1081–83 (considering goals of incarceration and programming). In *Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), for example, the Supreme Court concluded that men and women were not similarly situated with respect to the purpose of Selective Service registration.

> The purpose of registration was to prepare for a draft of combat troops.... [W]omen are excluded from combat.... Men and women, because of the combat restrictions on women, are simply not similarly situated *for purposes of a draft* or a registration for a draft.... The exemption of women from registration is not only sufficiently but also closely related to Congress' purpose in authorizing registration.

*Id.* at 77–79, 101 S.Ct. at 2658–59 (emphasis added). In contrast, the court repeatedly states that men and women prisoners are not similarly situated without ever mentioning the purpose with respect to which they are dissimilarly situated.[20] It is thus unsurprising that the court fixates on such irrelevancies as the size of the various facilities, which have everything to do with the cost of administering programs and nothing to do with determining which inmates are similarly capable of benefiting from them.[21] Notably, this was not an error into which the district court fell. *See, e.g., Women Prisoners I*, 877 F.Supp. at 675 (finding women at the Annex similarly situated to men at Minimum with respect to the purposes of programming because "[b]oth of these populations are preparing for release into the community and therefore[ ] have the same need to fully prepare themselves for this stage of their lives"). *See also Klinger*, 31 F.3d at 735 (McMillian, J., dissenting) (noting that men and women are equally capable of benefiting from programs).

Determining the purpose of government action before embarking on a similarly-situ-

---

**19.** The District asserted that women had more acute substance abuse problems than men, but the district court rejected the assertion as unfounded in the record. *Women Prisoners I*, 877 F.Supp. at 676. As *J.E.B.* and *VMI* make clear, however, even if the assertion were true, it would not justify using sex as a proxy for drug addiction.

**20.** The epitome of the court's approach is captured in the concluding paragraph of its analysis: "Given these significant differences in the situation of the women at the Annex and CTF and those of the men at the facilities with which the

court compared them ... *we need not examine the programs themselves* ...." Op. at 927–28.

**21.** "It is well-settled that financial hardship is not a defense to sex discrimination in prisons." *Klinger*, 31 F.3d at 736 (McMillian, J., dissenting) (citing *Shapiro v. Thompson*, 394 U.S. 618, 633, 89 S.Ct. 1322, 1330, 22 L.Ed.2d 600 (1969)). *See also Glover*, 478 F.Supp. at 1078 n. 2. *Cf. Pitts*, 866 F.2d at 1461–63 (finding District's attempts to ameliorate burden differentially imposed on women probative of lack of invidious discriminatory intent, even though attempts had been frustrated by budgetary constraints).

ated analysis is inherent in the individual nature of equal protection rights. For example, if the District determined that the purposes of a certain program would be better served if it were offered to prisoners who were relatively close to release,[22] then to determine whether two individuals were similarly situated with respect to the program's purpose would depend on how close each was to release. Asking whether members of that person's sex are generally close to release would not answer the question whether the *individual* is being treated arbitrarily.[23] It is only the rare situation in which every member of a quasi-suspect class is identically situated with respect to the governmental purpose, as in *Rostker,* in which a court can conclude that any individual class member's claim can be rejected at "the threshold." In other cases, even if general differences between most men and most women can be discerned, the government must still provide an "exceedingly persuasive" justification for categorically treating the sexes differently. *VMI,* —— U.S. at ——, 116 S.Ct. at 2275.

The court's failure to consider the purposes of the various prison programs at issue is perhaps understandable, inasmuch as the District has not supplied any. It is the government's burden to come forward with a justification for a sex-based classification, *id.,* yet the District's brief is silent on this point.[24] Without an explanation of the purpose of programming, the court is in no position to decide that male and female prisoners are categorically dissimilarly situated with respect to all of the various programs.

## C.

Even assuming the government may constitutionally provide separate programs for the sexes, the programs must be substantially equivalent. *VMI,* —— U.S. at —— —— ——, 116 S.Ct. at 2285–86 (quoting *Sweatt*); *Glover,* 478 F.Supp. at 1079.[25] The district court correctly applied this standard.[26] This does not mean, however, that all women must have access to the programming choices that are available to any man. Rational sex-neutral criteria, applied evenhandedly to men and women, may be used to determine eligibility for programs. *See J.E.B.,* 511 U.S. at —— & n.16, 114 S.Ct. at 1429 & n.16; Op. at 925 (quoting testimony of Ms. Regina Gilmore and Dr. T.A. Ryan). If custody level is such a criterion, for example, then medium-custody women would not be entitled to programs made available only to minimum-custody men.[27] However, if the District chooses

22. This is not to suggest that prisoners can be excluded from programs only by reference to the programs' purpose. Other governmental interests, such as public safety in administering a work furlough program, could support an exclusion.

23. *See* Schulhofer, *supra* n. 13, 143 PENN. L.REV at 2201.

24. The District did not address equal protection until its reply brief. The relevant portion of its opening brief was devoted solely to challenging the district court's findings of Title IX violations. Most of that discussion concerned whether certain programs were "educational" and thus subject to Title IX. Appellants' brief at 35–37, consisting largely of a lengthy quotation from *Klinger,* added that in any event there was no Title IX violation because female prisoners were not similarly situated to male prisoners. Only in the reply brief did the District extend its argument to cover equal protection.

25. *But see VMI,* —— U.S. at —— n. 7, 116 S.Ct. at 2276 n. 7 (quoting *Hogan,* 458 U.S. at 720 n. 1, 102 S.Ct. at 3334 n. 1) ("we are not faced with

the question of whether States can provide 'separate but equal' undergraduate institutions for males and females").

26. *See, e.g., Women Prisoners I,* 877 F.Supp. at 677 (finding no violation with respect to vocational training and apprenticeships because "women at the Annex and men at Minimum have equivalent access to meager offerings"); *id.* (finding that the District "fail[ed] to provide equivalent opportunity in the area of work details"); *id.* (finding that although the industrial programs at the Annex and Minimum differed in content, plaintiffs "have failed to prove that women prisoners ... do not receive industrial opportunities equivalent to male prisoners ...."); *id.* at 686 (¶ 84 of the order) (ordering the District to "provide women at CTF with a range of work opportunities that is equivalent to the range of work opportunities provided to male prisoners at the Occoquan, Central and Medium facilities").

27. In this example, medium-custody women would not be similarly situated to minimum-custody men with respect to the program, just as women who were categorically ineligible for

to house minimum- and medium-custody women in the same facility, it cannot use that fact to deny the programs to minimum-custody women. That is, the District may not treat differently men and women who are identical but for sex, something it surely would do by sending minimum-custody women to a facility where they are provided inferior programming to the programming available to minimum-security men.

When the sexes are permissibly segregated, "substantial equivalence" may not require perfectly identical treatment. Some differences may be unavoidable because of the physical separation. Moreover, the peculiar circumstances of prison administration may require different programs for prisoners housed in different facilities. *See Pitts,* 866 F.2d at 1455. While programming decisions are to be made by the District and not by the court, *cf. Jeldness v. Pearce,* 30 F.3d 1220, 1229 (9th Cir.1994) (applying Title IX to prison programs), the District must show that the important penological interests implicated by the policies of its various facilities have a substantial relationship to the denial of access by a female prisoner to a program available to male prisoners.[28] *Cf. North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). But as the court would have it, the mere existence of peculiar circumstances at each facility would insulate the government's treatment of the sexes from judicial comparison and the requirement to justify differences under heightened scrutiny standards.

The district court's analysis accounted for legitimate, sex-neutral criteria in comparing the programs available to men to those available to women. As the court notes, the district court considered "custody levels, sentence structures, and purposes of incarceration" of the prisoners. Op. at 924 (quoting *Women Prisoners I,* 877 F.Supp. at 675). On appeal, the District has not shown that the district court ignored any relevant criterion. In its opening brief, the District lists four criteria: number of inmates at an institution, "length of stay," classification level, and "special characteristics." As previously explained, the first and last of these are analytically inappropriate,[29] and the district court expressly considered the other two criteria. In its reply brief, the District focuses almost entirely on the physical differences between the facilities to which it has chosen to assign otherwise identical men and women,[30] yet such physical differences caused by the District itself cannot alone excuse sex-based discrimination. The court, meanwhile, faults the district court for not considering population size, other physical aspects of the sex-segregated facilities, and "special characteristics," which are all improper bases for treating women differently from men. Op. at 924–26. Otherwise, the court cites a list of criteria culled from the testimony of two witnesses, but points to no record evidence that the populations compared by the district court differed with respect to any of them. *Id.* at 925. In any event, the district court did consider at least some of the cited criteria,[31] and the District has not urged error based on any criterion that the district court

---

combat were not similarly situated to combat-eligible men with respect to draft registration in *Rostker.*

**28.** Thus, the court mischaracterizes the analysis of the dissent as tantamount to a conclusion that "if male inmates have access to a work detail that is unavailable to women," or "[i]f men can spend an extra hour a day in a gymnasium," then there is a violation of equal protection. Op. at 926. Rather, consistent with due deference to District officials that is consistent with constitutional protections, the District must explain the governmental purpose behind such differences for similarly situated prisoners. This imposes no liability as a result of program-by-program comparisons, *see* Op. at 927, but only recognizes that District officials are subject to the Constitution in its treatment of prisoners.

**29.** In addition, the district court considered and rejected as factually unfounded several of the "special characteristics" mentioned by the District. *Women Prisoners I,* 877 F.Supp. at 675–76.

**30.** For example, the District contends that medium-custody women at CTF cannot receive equal treatment to medium-custody men at Occoquan, Central, and Medium because the District has chosen to house the women in the same building as men who have physical impairments or who are undergoing substance abuse treatment.

**31.** The criteria mentioned by the two witnesses and considered by the district court included "custody level," "substance abuse information," and "impending factors relating to pre-release."

may have overlooked. Thus, even if one of the criteria mentioned by the witnesses were crucial to the analysis, the proper result would be to remand for the district court to receive further evidence and consider the relevant criterion. *Pargo v. Elliott,* 49 F.3d 1355 (8th Cir.1995).

For these reasons, I conclude that the District has demonstrated no error in the district court's analysis. The district court correctly found that women imprisoned at the Annex and CTF receive inferior programming because of their sex.[32] None of the arguments mustered by the court can change the inescapable fact that the District's policies would, solely on the basis of sex, send two otherwise identical people, convicted of the same crime, facing the same sentence, and imprisoned for the same purpose, to facilities offering substantially unequal programming. The court, by ignoring this fact, does not require the District to take even the most minimal steps to assure parity of access to opportunities between the sexes. Equal protection requires more. Unfortunately for the prisoners, and for the Constitution, the court has chosen to follow the example of another circuit that mistakenly believed that the government "could provide, with fidelity to the equal protection principle, separate and unequal educational programs for men and women." *VMI,* —— U.S. at ——, 116 S.Ct. at 2286 (reversing 44 F.3d 1229 (4th Cir.1995)).

Accordingly, I respectfully dissent from Parts II A and II B of the court's decision, and would remand the portions of the order vacated in those parts of the opinion so that the district court could consider the impact, if any, of the Prison Reform Act of 1995.

---

*Women Prisoners I,* 877 F.Supp. at 675 ("[t]he Court will compare prisoners who are similarly situated by virtue of their similar custody levels"); *id.* ("[a] comparison [of women at CTF] to CTF men would be inappropriate because the men reside at CTF for either short-term diagnostic attention of a voluntary 18–month intensive substance abuse program"); *id.* (comparing women at Minimum to men at Annex because both "are preparing for release into the community").

**32.** The court, Op. at 925, overlooks the district court's specific findings in regard to educational opportunities, *inter alia,* in support of its conclusion that "women at CFT do not have reasonable opportunities for similar studies [as men] and do not have an equal opportunity to participate in programs of comparable quality [as are available to men]." *Women Prisoners I,* 877 F.Supp. at 678.